**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

THE ESTATE OF                                                    PLAINTIFFS
JOSEPH CONWAY MANUS, et al.

V.                                          CIVIL ACTION NO. 1:11-CV-00149-SA-DAS

WEBSTER COUNTY, MISSISSIPPI, et al.                             DEFENDANTS

## MEMORANDUM OPINION

This cause comes before the Court on Defendants' motions for summary judgment, Defendants' motions to exclude Plaintiffs' experts [166], [167], [283], [285], [287], and Defendants' Motion to Strike [172]. Upon due consideration of the motions, responses, rules, and authorities, the Court finds as follows:

### FACTUAL AND PROCEDURAL BACKGROUND

The facts of this matter are complex and highly disputed. Joseph Conway Manus ("Manus") originally brought this action, asserting constitutional claims brought through 42 U.S.C. § 1983, as well as various state law claims. Manus alleged that on September 7, 2010 law enforcement officers from Webster County, Mississippi; Eupora, Mississippi; and Mathiston, Mississippi used excessive force against him in order to effectuate an unlawful arrest and denied him medical care during the seven days that he was in their custody. As a result, Manus claimed he suffered serious injuries, including quadriplegia.[1] Manus died on December 1, 2012, while this lawsuit was pending.

After his death, Manus' widow, Miranda Manus, acting on her own behalf as well as with Manus' mother, Lois Manus, on behalf of all wrongful death beneficiaries, and Manus' estate were substituted as Plaintiffs. Plaintiffs filed an Amended Complaint adding a claim for

---

[1] Dr. Louis Rosa diagnosed Manus with quadriplegia caused by a fracture at the C6-C7 vertebrae on September 16, 2010, two days after Manus was transported from the Webster County jail to the hospital.

wrongful death on June 6, 2013. Named Defendants to this action are Webster County Sheriff Phillip Smith, Deputy Jeremy Kilgore, Deputy Derek May, Webster County Jailers Shay Holmes and Toby Britt, and Webster County, Mississippi ("County Defendants"); Eupora Police Chief Gregg Hunter, Officer Keith Crenshaw,[2] Officer Mitch Jackson, the municipality of Eupora, Mississippi, Mathiston Police Chief Roger Miller, Officer Shane Box, and the municipality of Mathiston, Mississippi (Municipal Defendants). All Defendants have filed motions for summary judgment, asserting, among other things, that Plaintiffs' claims are barred by the doctrines of qualified immunity and the Mississippi Tort Claims Act.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air

---

[2] Officer Crenshaw died on October 23, 2013. His estate has been substituted as a party defendant.

Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

Ordinarily, when contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) . Still, the Fifth Circuit has held that in the case of a bench trial, "a district court has somewhat greater discretion to consider what weight it will accord the evidence. When deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." Johnson v. Diversicare Afton Oaks, LLC, 597 F.3d 673, 676 (5th Cir. 2010) (internal citations omitted). Indeed, the Fifth Circuit has stated that "it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, *unless those inferences involve issues of witness credibility or disputed material facts*. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should 'draw his inferences without resort to the expense of trial.'" Matter of Placid Oil Co., 932 F.2d 394, 398 (5th Cir. 1991) (emphasis added) (quoting Nunez v. Superior Oil Co., 572 F.2d 1119, 1124 (5th Cir. 1978)).

# ANALYSIS AND DISCUSSION

## I.  Official Capacity Claims Against Individual County Defendants

Plaintiffs brought suit against all individually named Defendants in both their personal and official capacities.  Unlike suits against officers in their personal capacities, suits brought against officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. N.Y.C. Dep't of Social Svcs, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (citing Brandon v. Holt, 469 U.S. 464, 471–72, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985)).  Accordingly, the dismissal of allegations against municipal officers in their official capacities is proper when the allegations duplicate claims against the governmental entity itself.  See Castro Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001).

County Defendants argue that the allegations against the individual County Defendants in their official capacities are duplicative and should be dismissed.[3]  Though Plaintiffs argue that their official capacity claims against the individual County Defendants are not duplicative of their claims against Webster County, they give no explanation as to how those claims differ. Rather, Plaintiffs cite several cases of nonbinding authority dealing with courts' attempts to identify the nature of liability sought by plaintiffs when complaints do not specify whether officials are being sued in their personal or official capacities. See Mosby v. Moore, 716 So. 2d 551, 557 (Miss. 1998); Fitzgerald v. McDaniel, 833 F.2d 1516, 1520 (11th Cir. 1987); Conner v. Reinhard, 847 F.2d 384, 394 (7th Cir. 1988).  These cases are inapplicable to the case at bar as

---

[3] Municipal Defendants do not address this issue in their motion for summary judgment.

Plaintiffs specifically stated in their Amended Complaint that they are suing "all public employees in their official and individual capacities." Further, Plaintiffs' arguments that "[t]he officers should not be dismissed as there are claims of individual liability" and that "[s]ummary judgment on individual capacity claims is precluded" have no bearing on whether Plaintiffs' *official capacity* claims against the individual County Defendants should be dismissed. As such, the Court finds the dismissal of Plaintiffs' claims against the individual County Defendants in their official capacities merited.

II.     § 1983 Claims and Qualified Immunity

Liability may be imposed upon any person who, acting under the color of state law, deprives another of federally protected rights. 42 U.S.C. § 1983. Section 1983 does not create substantive rights; rather, it merely provides a remedy for deprivations of rights established elsewhere. City of Okla. City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985). To bring an action within the purview of Section 1983, a claimant must first identify a protected life, liberty, or property interest, and then prove that government action resulted in a deprivation of that interest. Baker v. McCollan, 443 U.S. 137, 140, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979); Mahone v. Addicks Utility Dist., 836 F.2d 921, 927 (5th Cir. 1988); Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir.1984).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (internal quotations omitted). "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability." Id., 129 S. Ct. 808 (internal quotations omitted). Once a government official asserts qualified immunity, it is the plaintiff's

burden to prove that the official is not entitled to it. <u>Michalik v. Hermann</u>, 422 F.3d 252, 258 (5th Cir. 2005).

In evaluating qualified immunity, the Court employs a two-step process. <u>Cantrell v. City of Murphy</u>, 666 F.3d 911, 922 (5th Cir. 2012), <u>cert. denied,</u> 133 S. Ct. 119, 184 L. Ed. 2d 25 (2012). The Court must determine (1) whether the plaintiff has alleged a violation of a clearly established constitutional right and (2) whether the government official's conduct was objectively reasonable under the law at the time of the incident. <u>Michalik</u> at 257-58. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Reichle v. Howards</u>, --- U.S. ---, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotations omitted). "Thus, the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Mendenhall v. Riser</u>, 213 F.3d 226, 230 (5th Cir. 2000) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The Court may address these issues in any order according to its sound discretion and in light of the circumstances of the case at hand. <u>Pearson</u>, 555 U.S. at 236, 129 S. Ct. 808.

### a.    *Arrest-related Claims*

Plaintiffs contend that Defendants violated Manus' right to be free from unlawful arrest, unlawful search and seizure, and unlawful detention and confinement in violation of the Fourth, Fifth,[4] and Fourteenth Amendments. Plaintiffs claim that on September 7, 2010, Webster County Deputies Derek May and Jeremy Kilgore illegally entered Manus' residence without an arrest warrant or consent. Deputy May and Deputy Kilgore claim they were instructed by Webster County Sheriff Phillip Smith to take Manus into custody because his bond for pending

---

[4] In response to Municipal Defendants' motion for summary judgment, Plaintiffs concede their Fifth Amendment claims must fail because there is no evidence any of the Defendants were federal actors. As such, summary judgment is appropriate as to Plaintiffs' Fifth Amendment claims.

criminal charges had been revoked. Plaintiffs, on the other hand, claim Manus had been given a new bond on other pending criminal charges and contend "no valid order revoking Manus' [prior] bond was ever filed or created."

*i.       Unlawful Arrest*

"When an individual asserts a claim for wrongful arrest, qualified immunity will shield the defendant officers from suit if a reasonable officer could have believed [the arrest at issue] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." Mendenhall, 213 F.3d at 230 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (further citation omitted)).

The record shows that Manus was arrested on charges of assaulting a law enforcement officer in June 2010 and was released on bond. Then, in July 2010, Manus was arrested again on charges of domestic violence and issued a new bond. Manus entered a court ordered drug and alcohol treatment program on or around August 6, 2010 and was released on September 4, 2010. Defendants contend that Manus' bond from the June 2010 incident was revoked as a result of the July 2010 charges and that Manus should have been transferred directly from the drug and alcohol treatment facility to the Webster County jail. Instead, Manus returned to his mother's home.

Deputy Kilgore testified in his deposition that on September 7, 2010 Sheriff Smith told him that Manus' bond had been revoked and to "go pick him up." Deputy Kilgore claimed that he called Deputy May to assist him and that, prior to going to Manus' residence, Deputy May called Justice Court Judge Rebecca Ellison to confirm that Manus' bond had been revoked. Deputy May corroborated this account in his own deposition testimony, stating that he called Judge Ellison when he learned that Manus had been released from the drug and alcohol treatment

facility. According to Deputy May, Judge Ellison confirmed that Manus' bond was revoked and told him that "if [Manus] was out of rehab, he needed to be picked up and back in jail." Likewise, Judge Ellison testified in her deposition that Deputy May called her and that she told him to pick Manus up because his bond had been revoked.

It is undisputed that Deputy May and Deputy Kilgore had no paperwork with them when they arrived at Manus' residence. Judge Ellison testified in her deposition that on July 27, 2010, as a result of Manus being charged with domestic violence, she held a bond revocation hearing in the county jail. Judge Ellison testified that she set Manus' bond at $10,000 on the domestic violence charge and at the same time revoked his bond from the prior pending charges. Judge Ellison explained that if a person is:

> there on a second felony charge, you tell them that, look, you are out on bond on a felony charge and here you've done – you've committed another felony. And the procedure is that we revoke the bond on the first charge. And you have to sit in jail until you go to court on that first charge, and then you can bond out on this.

There is no evidence in the record that Judge Ellison ever entered a revocation order. Defendants offer a document titled, "Motion for Appointment of Attorney" that contains a handwritten note stating, "Has 2 previous felony charges which have not gone to court ($13,000 Bond) → Revoked due to new felony charge." Judge Ellison testified in her deposition that the note was written in her handwriting on July 27, 2010 and that she did not have to enter a bond revocation order for a bond to be revoked.[5] Judge Ellison also testified that because Manus'

---

[5] Under Mississippi law:

> If a person charged with committing any offense that is punishable by . . . imprisonment for one (1) year or more in the penitentiary or any other state correctional facility is granted bail and . . . if the court, upon hearing, finds probable cause that the person has committed a felony while on bail, then the court shall revoke bail and shall order that the person be detained, without further bail, pending trial of the charge for which bail was revoked. For the purposes of this subsection (2) only, the term "felony" means any offense punishable by death, life imprisonment or imprisonment for more than five (5) years under the laws of the jurisdiction in which the crime is committed.

bond had been revoked, she did not have to issue an arrest warrant in order for law enforcement officers to bring him into custody on September 7, 2010.

Sheriff Smith testified in his deposition that he instructed Deputy May and Deputy Kilgore to arrest Manus based on his belief that Judge Ellison had revoked Manus' bond. Thus, the record indicates that Deputy Kilgore and Deputy May went to Manus' residence based upon information from Sheriff Smith and Judge Ellison that Manus' bond had been revoked. Whether Judge Ellison's revocation of Manus' bond was valid or not, Plaintiffs offer no evidence that Sheriff Smith, Deputy Kilgore, or Deputy May had any reason to believe that it wasn't. Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether Sheriff Smith, Deputy May, and Deputy Kilgore acted objectively unreasonably in relying on Judge Ellison's statements that Manus' bond had been revoked and in believing that they therefore had probable cause to bring him into custody. Accordingly, Sheriff Smith, Deputy May, and Deputy Kilgore are entitled to qualified immunity, and summary judgment is proper with regard to Plaintiffs' claims of unlawful arrest.

Additionally, Plaintiffs acknowledge that shortly after Deputy May and Deputy Kilgore arrived at Manus' residence, Deputy May issued a call for assistance because Deputy Kilgore thought Manus had a knife. Defendants contend Sheriff Smith, Eupora Police Chief Gregg Hunter, Eupora Officer Keith Crenshaw, Mathiston Police Chief Roger Miller, and Mathiston Officer Shane Box arrived at Manus' residence in response to Deputy May's call for backup. Plaintiffs, however, argue that the true reason these Defendants arrived at the scene was to further a conspiracy to violate Manus' constitutional rights.

---

Miss. Const. art. III, § 29.

In support of this allegation, Plaintiffs cite the deposition testimony of Dr. Jewel Huffman, the emergency room physician who treated Deputy Kilgore for a cut to the head that he sustained during Manus' arrest. Dr. Huffman testified that after Manus' arrest, in the presence of Chief Hunter, Eupora Officer Mitch Jackson, Chief Miller, and Officer Box, Deputy Kilgore said, "Yeah, we tried to break his f**king neck," referring to Manus. Dr. Huffman further testified that in response to this statement "[t]hey all chuckled and laughed and kind of agreed. You know, nobody said anything, you know . . . ."

This testimony, however, does not have any bearing as to whether Sheriff Smith, Chief Hunter, Officer Crenshaw, Chief Miller, and Officer Box had reason to believe the arrest in progress was unlawful. The alleged statement of Deputy Kilgore does not serve to rebut Defendants' contention that these Defendants responded to Deputy May's call for backup to assist with the arrest of a person who had a knife and was resisting arrest. See Deville v. Marcantel, 567 F.3d 156, 166 (5th Cir. 2009) ("[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed.") (quoting Rogers v. Powell, 120 F.3d 446, 455 (3d Cir.1997)). Plaintiffs fail to raise a genuine issue of material fact as to whether these Defendants relied upon Deputy May's statements and whether doing so was objectively unreasonable. Accordingly, these Defendants are entitled to qualified immunity and summary judgment is warranted as to Plaintiffs' claims against them for unlawful arrest.[6]

---

[6] Plaintiffs generally allege that Defendants are liable for each cause of action stated in their Amended Complaint. With regard to the remaining Individual Defendants, it is undisputed that Webster County Jailers Shay Holmes and Toby Britt and Eupora Officer Mitch Jackson were not present at the scene and did not participate in the arrest of Manus. Thus, they are entitled to summary judgment as to Plaintiffs' arrest-related claims. With regard to Webster

*ii.        Unlawful Search and Seizure*

Plaintiffs additionally contend that Deputy Kilgore and Deputy May forcibly entered Manus' residence on September 7, 2010 without a warrant or consent. Lois Manus testified in her deposition that she did not give Deputy May and Deputy Kilgore permission to enter her home and that "Kilgore stuck his foot inside [her] door as [she] went to shut it and forced himself in." Deputy Kilgore's deposition testimony confirmed this as he testified that "when [Lois Manus] went in she tried to close the door. I kept the door opened. I did not want to – you know, her to lock us outside. . . . I propped the door open with my foot." Deputy May also testified in his deposition that Lois Manus did not give them permission to enter the home and that he also placed his foot in the door.

The Fifth Circuit has specifically held that "even if . . . officers ha[ve] probable cause to search [a] home, they ha[ve] to have exigent circumstances to enter without a warrant." United States v. Aguirre, 664 F.3d 606, 610 (5th Cir. 2011). "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). Further, "[w]hen the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." Id.

Deputy May claimed that he entered Manus' residence in "hot pursuit," a circumstance the Fifth Circuit has "recognized as an exigency justifying a warrantless search." Payne v. City

County and the municipalities of Eupora and Mathiston, the Court addresses liability for all claims against these entities in a later section of this opinion. See infra Section III.

of Olive Branch, 130 F. App'x 656, 662 (5th Cir. 2005) (citing United States v. Santana, 427 U.S. 38, 42-43, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976)). Deputy May testified in his deposition that Manus was outside when he and Deputy Kilgore arrived and that "Manus proceeded into the house and closed the door behind him before I could even exit my patrol car." Deputy May testified that he and Deputy Kilgore entered Manus' residence because "[Manus] was going into his house. We were going in to retrieve him." Manus and Lois Manus, on the other hand, testified that Manus was inside the residence when Deputy Kilgore and Deputy May arrived. Additionally, Deputy Kilgore testified that he and Deputy May stood outside Manus' residence and talked with Lois Manus "for about 15 minutes" before they entered the home. Deputy Kilgore testified that Lois Manus went into the residence claiming to go get Manus but that it sounded like she was talking to someone on the phone. Deputy Kilgore testified that he told May, "We need to go in." Viewing the evidence in the light most favorable to Plaintiffs, a genuine issue of material fact exists as to whether Deputy Kilgore and Deputy May violated Manus' rights by entering his residence without a warrant or consent.

Further, at the time of the incident, the law was clearly established that exigent circumstances must be present in order to execute a warrantless arrest in the home. See Payton v. New York, 445 U.S. 573, 590, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Accordingly, Deputy Kilgore and Deputy May are not entitled to qualified immunity and summary judgment is not proper as to Plaintiffs' claims against them for unlawful search and seizure.

However, the Court has determined that no genuine issue of material fact exists as to whether Sheriff Smith, Chief Hunter, Officer Crenshaw,[7] and Chief Miller entered Manus' residence in response to Deputy May's call for assistance involving an armed man resisting

---

[7] The Court notes that it has determined a genuine issue of material fact exists as to whether Officer Crenshaw actually entered the residence.

arrest. The Fifth Circuit has long recognized that "[e]xigent circumstances 'include those in which officers reasonably fear for their safety. . . .'" United States v. Rico, 51 F.3d 495, 501 (5th Cir. 1995) (quoting United States v. Mendoza–Burciaga, 981 F.2d 192, 196 (5th Cir. 1992), cert. denied, 510 U.S. 936, 114 S. Ct. 356, 126 L. Ed. 2d 320 (1993)). The Court finds that Deputy May's call for assistance created exigent circumstances sufficient to justify the entry of Sheriff Smith, Chief Hunter, and Chief Miller into the residence without a warrant or consent, and these Defendants are thus entitled to summary judgment as to Plaintiffs' claims against them for unlawful search and seizure.[8]

### b.      *Excessive Force*

Claims of excessive force used by law enforcement officials "in the course of making an arrest, investigatory stop, or other 'seizure' of [a plaintiff's] person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). When a plaintiff asserts claims for both unlawful arrest and excessive force, the Court must "analyze the excessive force claim without regard to whether the arrest itself was justified." Deville, 567 F.3d at 167 n.7 (quoting Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007)).

"[T]o state a violation of the Fourth Amendment prohibition on excessive force, the plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008) (citing Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004)). "The objective reasonableness of the force . . . depends on the facts and

---

[8] Additionally, it is undisputed that Officer Box never entered the residence. Therefore, summary judgment is merited as to Plaintiffs' claims against him for unreasonable search and seizure.

circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." Id. (citing Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996)). "Specifically, the court should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865). Importantly, an officer's subjective intent is irrelevant. Graham, 490 U.S. at 397, 109 S. Ct. 1865 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Plaintiffs argue that Defendants used excessive force in arresting Manus. In his deposition, Manus testified that he had just taken a shower and was in his bedroom getting dressed when his mother knocked on the door and told him law enforcement was there and wanted to speak with him. Manus testified that he did not immediately exit the room because he was putting on his clothes but that he did voluntarily exit his bedroom after Deputy Kilgore threatened to break down the door. Manus further testified that he was willing to go with Deputy Kilgore until he spun him around and threw him up against a door facing. At that point, according to Manus, he "kind of got away from [Deputy Kilgore] a little bit," and then Deputy Kilgore tased him. Manus testified that he retreated into his bedroom and that Deputy Kilgore and Deputy May called for backup because they thought he had a knife.

According to Manus, Sheriff Smith arrived and broke down the door to Manus' bedroom, and then, when Manus stood up, Deputy Kilgore handcuffed Manus' hands behind his back. Manus testified that after he was handcuffed, Sheriff Smith hit him in the back of the neck with a

bat and then again as he was falling to the ground.[9]  Manus also claims that Mathiston Police Chief Roger Miller had arrived and sprayed him in the face with mace as he was falling, that Deputy May tased him on the knee with a hand taser while he was handcuffed, and that Sheriff Smith dropped down onto Manus' neck with his knee with a large amount of force while Manus was lying handcuffed on the ground.  Manus testified that he did not resist the officers.

With regard to Deputy Kilgore, Manus testified that he tased him before Manus was handcuffed and after he "got away" from Deputy Kilgore.  Manus also testified that Deputy Kilgore thought he had a knife, though Manus claimed the object was actually a cellphone. Thus, according to Manus' own testimony, at the time Deputy Kilgore tased him, he was resisting arrest and Deputy Kilgore thought he posed a serious threat.  Plaintiffs have not demonstrated a genuine issue of material fact as to whether Deputy Kilgore's use of his taser was "clearly excessive to the need." Ikerd, 101 F.3d at 433-34.  Further, even if Deputy Kilgore's use of the taser did constitute excessive force, he is entitled to qualified immunity because his actions were not objectively unreasonable under clearly established law at the time of the incident. See Buchanan v. Gulfport Police Dep't, 2012 WL 1906523, at *9-10 (S.D. Miss. May 25, 2012) ("where the suspect is resisting arrest or disobeying the officers' orders, tasing may not be considered excessive force") (collecting cases), aff'd, 530 F. App'x 307 (5th Cir. 2013).

As to Deputy May, Manus testified that he was not resisting the officers and had his hands handcuffed behind his back when Deputy May deployed a hand taser on his knee.  Five years before this incident, the Fifth Circuit held that a law enforcement officer was not entitled to qualified immunity where the officer tased someone who was not resisting arrest, was committing only a minor crime, and posed no threat to the officer or others. Autin v. City of

[9] Sheriff Smith disputes this allegation but admits in his deposition testimony that he did have a bat with him when he arrived at Manus' residence.

Baytown, 174 F. App'x 183, 186 (5th Cir. 2005). The Fifth Circuit held that the three factors outlined in Graham were clearly established such that a reasonable officer would be charged with the knowledge that they "tend to indicate whether the use of force is appropriate." Id. Likewise, a reasonable officer in 2010 would have known that the Graham factors weighed against the use of a taser on a handcuffed suspect who posed little risk to officers or others and who was not resisting arrest. Accordingly, the Court finds that Plaintiffs have demonstrated a genuine issue of material fact with regard to whether Deputy May violated Manus' clearly established rights through the use of excessive force. Therefore, Deputy May is not entitled to qualified immunity, and summary judgment is not proper.

Similarly, genuine issues of material fact prevent the granting of summary judgment in favor of Sheriff Smith. Manus testified in his deposition that Sheriff Smith hit him in the back of the neck with a bat twice, that Sheriff Smith landed with force on his neck with his knee, and that he was handcuffed and compliant at all times. Again, the Court finds that no reasonable officer could have believed that hitting an arrestee who is handcuffed and not resisting arrest with a bat or slamming a knee down onto that arrestee's neck constituted reasonable force in light of the Graham factors. Thus, Sheriff Smith is not entitled to qualified immunity from Plaintiffs' claims of excessive force, and summary judgment is not appropriate. [10]

*i.      Fourteenth Amendment - Pretrial Detainee*

In addition to their claims of excessive force in violation of the Fourth Amendment, Plaintiffs argue that Defendants are also liable for the use of excessive force against Manus while he was a pretrial detainee in violation of the Fourteenth Amendment. Manus testified that Deputy May transported him to the Webster County jail and accompanied Webster County

---

[10] Additionally, Municipal Defendants concede that there "is a question of fact regarding whether Chief Roger Miller . . . can be held liable for excessive force pursuant to the Fourth Amendment . . . ."

Dispatcher/Deputy Toby Britt and Eupora Officer Mitch Jackson as they walked Manus to his cell. Plaintiffs allege that Officer Jackson pulled Manus from the patrol car and dropped him on the ground, that Officer Jackson slammed Manus into the cell bars as he escorted him to his cell, and that Officer Jackson intentionally tripped Manus causing him to fall face forward onto the floor when Manus was placed in the cell. Municipal Defendants concede that there is a "question of fact regarding whether . . . [Officer Mitch Jackson] is liable for excessive force pursuant to the Fourth Amendment." However, they contend that Manus was an arrestee at the time of any alleged use of excessive force against him because "[a]ll of the Municipal Defendants' alleged wrongful conduct occurred *before* [Manus] was placed in his cell at the Sheriff's Department." (emphasis in original). Municipal Defendants argue that Plaintiffs' Fourteenth Amendment claims must therefore be dismissed.

The Fifth Circuit has held that, unlike an arrestee, "[a] pretrial detainee receives the protection of the Due Process Clause of the Fourteenth Amendment." Bros. v. Klevenhagen, 28 F.3d 452, 455-56 (5th Cir. 1994) (citing Valencia v. Wiggins, 981 F.2d 1440, 1443–45 (5th Cir. 1993), cert. denied, 509 U.S. 905, 113 S. Ct. 2998, 125 L. Ed. 2d 691 (1993)). However, "the point at which an arrest ends and pretrial detainment begins is not always clear." Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998) (citation omitted).

While the Fifth Circuit has held that "seizures of the person do not end at the initial moment of seizure," United States v. McRae, 702 F.3d 806, 833 (5th Cir. 2012), cert. denied, 133 S. Ct. 2037, 185 L. Ed. 2d 887 (2013) (citing Graham, 490 U.S. at 394–96, 109 S. Ct. 1865), "[h]ow long the seizure of the person goes on . . . is not defined with precision in [the Fifth] [C]ircuit, and it is a question that divides other circuits." Id. (citing Bros., 28 F.3d at 455–57; Valencia, 981 F.2d at 1443–44). Still, the Fifth Circuit has held that the Fourth Amendment does

not provide "an appropriate constitutional basis for protecting against deliberate official uses of force occurring . . . *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." Valencia, 981 F.2d at 1443-44 (emphasis in original).

In the case at bar, Manus had not been "in detention awaiting trial for a significant period of time" when Officer Jackson's alleged actions took place. Id. Neither had he been "released from the arresting officer's custody." Id. Thus, Plaintiffs' claims against Jackson are properly analyzed under the Fourth Amendment, and summary judgment is merited as to their excessive force claims against him in violation of the Fourteenth Amendment. Whereas Plaintiffs concede there is no evidence to support their Fourteenth Amendment excessive force claims against Chief Hunter and Officer Crenshaw, summary judgment is also appropriate as to those claims. Further, Plaintiffs fail to allege any use of force by other Defendants that might violate the Fourteenth Amendment, and thus, the Court finds summary judgment warranted as to all of Plaintiffs' Fourteenth Amendment excessive force claims. [11]

### ii.      Bystander Liability

It is undisputed that Webster County Jailer/Dispatcher Shay Holmes was not present at the scene when Manus was arrested, and Plaintiffs have not alleged that Holmes used or

---

[11] Plaintiffs also admit in response to Municipal Defendants' motion for summary judgment that their claims of violations of the Eighth Amendment "may not apply." Plaintiffs acknowledge that the Eighth Amendment applies only to convicted prisoners rather than pretrial detainees but claim that Defendants contend Manus was a convicted prisoner who was not free to leave the Webster County jail. See Hare v. City of Corinth, Miss., 74 F.3d 633, 639 (5th Cir. 1996) ("The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, and, with a relatively limited reach, from substantive due process. The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment.") (citations omitted). Plaintiffs cite no evidence that Manus had been convicted of any crime in September 2010. Rather, the record shows that Manus was a pretrial detainee awaiting trial on numerous pending charges. Accordingly, summary judgment is appropriate with regard to Plaintiffs' Eighth Amendment claims.

witnessed excessive force against Manus at any time. Therefore, she cannot be liable for Plaintiffs' claims of excessive force, and summary judgment as to those claims is appropriate with regard to Holmes. However, Plaintiffs contend Eupora Police Chief Gregg Hunter, Eupora Officer Keith Crenshaw, and Mathiston Officer Shane Box are liable for witnessing the use of excessive force by the other officers and failing to prevent or stop it, though they are not alleged to have used force against Manus themselves.

The Fifth Circuit has held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995) (citation omitted). Further, "[t]he fact that [officers] [a]re from different law enforcement agencies does not as a matter of law relieve [them] from liability for a failure to intervene." Id. "[L]iability under § 1983 can attach when the bystander officer 'had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it.'" Deshotels v. Marshall, 454 F. App'x 262, 268 (5th Cir. 2011) (citing Hale, 45 F.3d at 919).

Municipal Defendants concede a genuine issue of material fact exists as to whether Chief Miller witnessed Sheriff Smith hit Manus with a bat such that he might be liable as a bystander. However, it is undisputed that Officer Box never entered Manus' residence and did not witness the alleged use of excessive force by the other officers. Thus, he cannot be liable under a theory of bystander liability, and summary judgment as to Plaintiffs' excessive force claims against him is appropriate. See Whitley v. Hanna, 726 F.3d 631, 648 (5th Cir. 2013) (officers who were not in the presence of officer alleged to have used excessive force were "not bystanders for purposes of a bystander liability claim.").

With regard to Chief Hunter and Officer Crenshaw, Manus testified in his deposition that they were both in his bedroom but he only saw them as he was being escorted out and that he did not know if they were there the entire time or when they arrived. However, Lois Manus testified that Chief Hunter and Officer Crenshaw stood on either side of Manus' bedroom door during the alleged use of excessive force against Manus. She testified that when Chief Hunter and Officer Crenshaw arrived, Manus was on the floor with "Kilgore on top of him, May holding a taser to his knee, Roger Miller macing him, Phillip Smith standing over the top of him . . . ." She further testified that Manus was not resisting the officers while these events were taking place.

Whereas the Court has determined that a genuine issue of material fact exists as to whether Deputy May used excessive force against Manus and Municipal Defendants concede that a genuine issue of material fact exists with regard to Chief Miller's alleged use of excessive force, the Court finds that Plaintiffs have likewise raised a genuine issue of material fact as to whether Chief Hunter and Officer Crenshaw witnessed the use of excessive force against Manus and failed to take reasonable steps to protect him. Further, as it is undisputed that Sheriff Smith, Chief Miller, Deputy May, and Deputy Kilgore were in the bedroom at all times during the altercation, genuine issues of material fact also exist with regard to whether each of these officers likewise witnessed the use of excessive force by others and failed to protect Manus.

Hale was decided in 1995, fifteen years prior to the incident at issue. 45 F.3d 914. Therefore, the duty of an officer to take reasonable measures to protect a suspect from another officer's use of excessive force in his presence was clearly established at the time of the incident such that a failure to do so would have been objectively unreasonable. See id. at 919. Accordingly, Chief Hunter, Officer Crenshaw, Sheriff Smith, Deputy May, Chief Miller, and

Deputy Kilgore are not entitled to qualified immunity, and summary judgment is improper as to Plaintiffs' claims against them for excessive force based upon a theory of bystander liability.

Further, in light of Manus' testimony that Webster County Dispatcher/Deputy Toby Britt and Deputy May were present when Officer Jackson allegedly used excessive force against him, these Defendants may be liable for failing to "take reasonable measures to protect" Manus. Id. Whereas the Court has determined that such a duty was clearly established at the time of the incident at issue, Britt and Deputy May are not entitled to qualified immunity, and summary judgment is improper as to Plaintiffs' excessive force claims against them based upon a theory of bystander liability.

<em>c.        Denial of Medical Treatment</em>

The Court has determined that a genuine issue of material fact exists as to whether Sheriff Smith hit Manus in the neck with a baseball bat and/or landed his knee on Manus' neck with force. See supra Section II(b).  Additionally, the Court has determined that genuine issues of material fact exist as to whether Deputy May, Deputy Kilgore, Chief Miller, Chief Hunter, and Officer Crenshaw witnessed the alleged use of excessive force against Manus, including the use of a bat by Sheriff Smith. See supra Section II(b)(ii).  Plaintiffs claim that Manus requested medical treatment from each of these Defendants at the scene of his arrest on September 7, 2010 and that each Defendant denied his request.  Plaintiffs argue that, given these Defendants' participation in and/or knowledge of the excessive force used against Manus during his arrest, their refusal to provide him medical assistance amounts to deliberate indifference.

Additionally, Plaintiffs claim that during Manus' detention at the Webster County jail, from September 7, 2010 to September 14, 2010, Manus' health rapidly deteriorated to the point that when he was finally transported to the hospital he was unconscious and had lost the use of

his arms and legs. Plaintiffs claim Manus requested medical assistance from Sheriff Smith, Officer Jackson, Deputy May, Webster County Jailers Shay Holmes and Toby Britt, and other Webster County employees not named as party defendants in this action. Plaintiffs claim Defendants ignored his requests despite his obvious need for immediate medical attention.

Plaintiffs contend that Defendants denied Manus medical treatment both at the scene of his arrest and while he was in custody at the Webster County jail. The Fifth Circuit has held that denial of medical care claims by arrestees are analyzed under the same standards as claims by pretrial detainees. Nerren v. Livingston Police Dep't, 86 F.3d 469, 472-73 (5th Cir. 1996) ("We discern no reason to carve out a separate standard for arrestees, a subset of pretrial detainees. After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment.") (citing Bell v. Wolfish, 441 U.S. 520, 523, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).

Further, the Fifth Circuit has held that "[t]he appropriate standard to apply in analyzing constitutional challenges by pretrial detainees depends on whether the alleged unconstitutional conduct is a 'condition of confinement' or 'episodic act or omission.'" Gibbs v. Grimmette, 254 F.3d 545, 549 n.2 (5th Cir. 2001) (citation omitted). "When the alleged unconstitutional conduct involves an episodic act or omission, the question is whether the state official acted with deliberate indifference to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate." Id. at 548 (citing Hare, 74 F.3d at 645) (further citation omitted)). In other words, "[w]hen the alleged constitutional violation is a particular act or omission by an individual that points to a derivative policy or custom of the municipality, [courts] apply the deliberate indifference standard." Id. at 549 n.2 (citation omitted); see also

Brown v. Bolin, 500 F. App'x 309, 312-13 (5th Cir. 2012), cert. denied, --- U.S. ---, 133 S. Ct. 2833, 186 L. Ed. 2d 885 (2013) ("In these cases . . . the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.") (quotation omitted)).

"Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Brown v. Callahan, 623 F.3d 249, 255 (5th Cir. 2010) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).   "To prove deliberate indifference, a pretrial detainee must show that the state official knew of and disregarded an excessive risk to the inmate's health or safety." Gibbs, 254 F.3d at 548-49 n.5 (citing Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir.1999)). "Deliberate indifference is more than mere negligence in failing to supply medical treatment." Id. (citing Stewart, 174 F.3d at 534; Williams v. Treen, 671 F.2d 892, 901 (5th Cir. 1982)). "Disagreement with medical treatment alone cannot support a claim under § 1983." Id. (citing Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997)).

*i.     Arrest*

Manus' own deposition testimony, as well as the testimony of Lois Manus, contains contradictory claims as to from whom Manus requested medical care while at his residence. Additionally, despite Plaintiffs' argument that Manus was unable to walk to Deputy May's patrol car following the altercation on September 7, 2010, Manus himself testified that he walked out of the residence, and it is undisputed that Manus was conscious and speaking when he was placed in the patrol car.  With regard to Officer Box, Plaintiffs fail to allege that he had any involvement with Manus' medical treatment after he was in custody at the Webster County jail.  Thus, the Court finds that even if Manus requested medical care from Officer Box at the scene of the

arrest, Plaintiffs have failed to raise a genuine issue of material fact as to whether Officer Box "knew of and disregarded an excessive risk" to Manus' health and safety. Id. Therefore, Officer Box is entitled to qualified immunity as to Plaintiffs' claims for denial of medical care, and summary judgment is merited.

Similarly, with regard to Webster County Dispatcher/Deputy Toby Britt, Plaintiffs have offered no evidence that he had any knowledge of the alleged actions of the officers inside Manus' bedroom. Though Manus testified that Britt and Officer Jackson "dragged" him out of Deputy May's patrol car, Manus also testified that, "Toby Britt never bothered me." Manus' deposition testimony indicates that Deputy Britt was present when Officer Jackson allegedly slammed Manus into the cell bars. Further, Manus testified that he was bleeding from the back of his head and that he asked to go to the emergency room because his neck was hurting. Nevertheless, though Britt may be liable for failing to protect Manus from Officer Jackson's alleged use of excessive force, the Court finds his failure to provide medical care to Manus did not amount to deliberate indifference as the evidence does not show that Britt knew of an excessive risk to Manus' health and safety. Id. Accordingly, Britt is entitled to qualified immunity, and summary judgment is appropriate with regard to Plaintiffs' claims against him for denial of medical care.

As to Sheriff Smith, Deputy Kilgore, Deputy May, Chief Miller, Chief Hunter, and Officer Crenshaw, the Court has determined that genuine issues of material fact exist with regard to whether Sheriff Smith hit Manus twice in the neck with a bat and whether each of these Defendants witnessed Sheriff Smith's alleged conduct. Accordingly, the Court finds that genuine issues of material fact also exist as to whether these Defendants had "subjective knowledge of a substantial risk of serious medical harm" and were deliberately indifferent in

disregarding that risk. <u>Nerren</u>, 86 F.3d at 473 (citing <u>Hare</u>, 74 F.3d at 650). Additionally, the Court finds that the right of arrestees, as a subset of pretrial detainees, "not to have their serious medical needs met with deliberate indifference" was clearly established at the time of the incident. <u>Thompson v. Upshur Cnty., TX</u>, 245 F.3d 447, 457 (5th Cir. 2001). Therefore, the Court finds these Defendants are not entitled to qualified immunity with respect to Plaintiffs' claims against them for denial of medical treatment, and summary judgment is not warranted.

### ii. Pretrial Detainment

### 1. September 8, 2010

Manus testified in his deposition that when he woke on the morning of September 8, 2010, his "legs were getting numb." Webster County Dispatcher Amy Hart testified in her deposition that early that morning Manus requested that he be taken to the emergency room because his neck and shoulder hurt and he was bleeding. She testified that she notified Webster County Jail Administrator Devin Mixon[12] who refused to authorize Manus' transport to the hospital. Hart testified that she also notified Webster County Jailer/Dispatcher Shay Holmes that Manus had requested to go to the emergency room but that Mixon had not authorized it.

Manus testified that he used a pay phone outside of his cell to call his aunt and mother. Manus claims that he told his mother he needed an ambulance but that Defendants were refusing to take him. Lois Manus testified in her deposition that she was in Tupelo, Mississippi at the time and called 911 from her cellphone. Manus testified that when the paramedics arrived, Holmes and Sheriff Smith walked with them to Manus' cell. Manus testified that he had to hold onto the cell door in order to walk to another cell for the paramedics to examine him but that the paramedics "checked him out" and told him there was nothing wrong with his legs.

---

[12] The Court notes that Devin Mixon is not named as a Defendant in this action.

Paramedic Corrie Bennett testified in her deposition that Manus had a closed laceration to the head, and that he told her he was hurting all over and that he had been involved in an altercation with law enforcement the day before where he had been tased multiple times. However, she also testified that he was able to stand without assistance, had normal vital signs, and did not have any obvious injuries based on her physical assessment that would require immediate transport to a hospital. Bennett testified that she explained her findings to Sheriff Smith and that she told him it was up to him whether Manus was transported to the hospital. Manus and Bennett both testified that Sheriff Smith refused to transport Manus to the hospital. Bennett also testified that she advised Sheriff Smith that he could give Manus over-the-counter medication for pain and that if Manus' condition worsened, Sheriff Smith might need to either recall the paramedics or transport Manus to the hospital. Manus testified that Sheriff Smith gave him Ibuprofen and water.

### 2. *September 9-10, 2010*

Manus testified that sometime during the night of September 8, he began losing feeling in his arms and couldn't stand but that he went back to sleep. Shay Holmes testified that on the morning of September 9 Manus asked to go to a doctor because his head was hurting and that she notified Webster County Jail Administrator Devin Mixon. She also testified that she gave Manus Ibuprofen on that day.

Manus testified that when he woke up on September 9, 2010, he asked for a shower but was still unable to stand. Manus testified that Webster County Dispatcher Amanda Vance and Webster County trustee Eddie Joe Wofford had to drag him to the showers, take off his clothes, and physically help him take a shower. Manus testified that he requested medical attention from Vance and Wofford but that he did not receive any response to his request. Manus testified that

Wofford had to drag him back to his cell because he still could not walk and that Vance and Wofford dressed him. Manus testified that the last thing he recalled was requesting medical assistance from Vance and Wofford in his cell.

Vance testified in her deposition that she had no recollection of assisting Manus with a bath on September 9 but that she did so on September 10. She testified that on September 10, Wofford notified her that Manus was weak and that Manus told her he needed his potassium medication. Vance testified that she contacted Manus' aunt who brought his medication to the jail. Manus testified in his deposition that he took potassium daily and that when he didn't take it, he would experience the same feeling of numbness or heaviness in his legs and arms that he felt on September 8-10, 2010. Manus also testified that he did not take any potassium until his aunt brought it to him at the jail. Vance testified that she notified Devin Mixon and Webster County Dispatcher/Deputy Toby Britt that Manus was weak and needed to be observed. Vance further testified that she did not contact Sheriff Smith.

Additionally, Justice Court Judge Rebecca Ellison testified in her deposition that at some point she went to the Webster County jail where she conducted initial appearance proceedings for Manus on new charges stemming from the incident at Manus' residence on September 7, 2010.[13] Judge Ellison testified that she conducted the proceedings while Manus was lying in his cell because she was told that he "didn't feel good." She testified that she asked Manus if he was okay and that he told her, "Well, my legs are tingling a little bit." Judge Ellison testified that she told Devon Mixon and Amanda Vance that they should take Manus to the doctor but that she did not know whether they were going to take him.

---

[13] Defendants offer into the summary judgment record a Certificate of Initial Appearance dated September 10, 2010 and signed by Judge Ellison.

### 3. September 11-12, 2010

Manus testified that he didn't remember anything from the time he returned to his cell from taking a shower until September 14, 2010 when he testified that Eddie Joe Wofford told him "they were going to send [him] somewhere to get [him] some help." Toby Britt testified in his deposition that he worked from midnight on September 10, 2010 until noon on September 11, 2010 and that Manus appeared to be sleeping when he checked on him. Webster County Dispatcher Becky Pate testified in her deposition that she worked from noon until midnight on September 11, 2010 and that she gave Manus his medication, saw him sit up on the side of the bed, and heard him talk to other inmates. She further testified that she worked again from noon until midnight on September 12, 2010 and that she saw him sit up in the bed on that day as well. Devin Mixon also testified that he checked on Manus at midnight on September 11, 2010 and that he appeared to be sleeping.

### 4. September 13, 2010

Shay Holmes testified in her deposition that Manus did not answer her when she spoke to him on September 13, 2010. She testified that he was laying in his bunk under a blanket and that he looked at her and followed her with his eyes but did not verbally respond. Holmes testified that she called Devin Mixon and requested that he come to the jail because she "thought that something was wrong" based on her prior experiences with Manus. Holmes testified that Mixon told her to call Sheriff Smith. She testified that she called Sheriff Smith repeatedly but was unable to reach him and did not remember if Sheriff Smith came to the jail that day. Sheriff Smith testified in his deposition that he didn't recall anyone contacting him about Manus' condition until the next day, September 14, 2010.

Holmes also testified that she observed Manus talking "gibberish" and that his chest was a "yellow-greenish" color. She testified that she called Webster County Deputy Andy McCant to come and check on Manus. Holmes testified that after observing Manus, McCant tried to reach Sheriff Smith by phone but was also unable to reach him. Holmes testified that before she left the jail, she notified Becky Pate, the next Webster County Dispatcher on duty of her concerns regarding Manus and that McCant was looking for Sheriff Smith.

5.  *September 14, 2010*

Holmes testified in her deposition that the next day, September 14, Sheriff Smith told her that he was going to call Dr. Huffman, who worked at the emergency room of North Mississippi Medical Center – Eupora, to come check on Manus. She testified that when Dr. Huffman had not arrived some two hours later, she contacted Sheriff Smith who came to the jail, checked on Manus, and told her to call an ambulance, which she did. Sheriff Smith testified that a dispatcher contacted him on September 14, saying that Manus was "talking out of his head" and that he responded by going to the jail to check on Manus. He testified that when he got to the jail Manus was nonresponsive, and he had the jailers call the paramedics.

. . . . . . . . . . . . . . . . . .

Though the Court has determined that genuine issues of material fact exist as to whether Sheriff Smith beat Manus with a bat and whether he responded to Manus' serious medical needs with deliberate indifference by refusing medical care at the scene of the arrest, the Court finds that Plaintiffs have failed to show Sheriff Smith acted with deliberate indifference when he refused to transport Manus to the hospital on September 8, 2010. Manus was examined by paramedics who found no obvious signs of injury or need for immediate transport to a hospital. Though the record shows it was ultimately Sheriff Smith who made the decision not to transport

Manus for further evaluation or treatment, the record evidence shows that this decision did not contradict the opinion or recommendation of the paramedics. Further, Sheriff Smith did provide Manus with some treatment in accordance with the paramedic's directions. See Paris v. Thomas, 51 F.3d 1045, 1045 (5th Cir. 1995) ("A disagreement with the treatment received or even a complaint of negligence or malpractice is insufficient to give rise to a section 1983 claim.").

Further, Plaintiffs fail to establish that Sheriff Smith had any knowledge of Manus' condition after September 7, 2010 or in any way participated in his treatment or lack thereof until September 14, 2010. To impose liability, "[Plaintiffs] must show that [Sheriff Smith] 'refused to treat [Manus], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" Burton v. Owens, 511 F. App'x 385, 389 (5th Cir. 2013), cert. denied, 134 S. Ct. 89, 187 L. Ed. 2d 32 (2013) (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985)). Plaintiffs fail to establish any such conduct by Sheriff Smith, and therefore, the Court finds Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether Sheriff Smith acted with deliberate indifference in response to Manus' serious medical needs while he was detained at the Webster County jail.

Similarly, Plaintiffs fail to establish a genuine issue of material fact as to whether Shay Holmes "knew of and disregarded an excessive risk to [Manus'] health or safety." Gibbs, 254 F.3d at 548-49 n.5 (5th Cir. 2001) (citation omitted). Rather than ignoring Manus' complaints and condition, the record evidence shows that Holmes reported each of Manus' requests to her for medical care to her supervisor, that she administered medication to Manus, and that she was ultimately responsible for the paramedics being called to attend to Manus. Even if Holmes was negligent for not calling the paramedics herself, her actions do not "evince a wanton disregard

for [Manus'] serious medical needs." Johnson, 759 F.2d at 1238. Accordingly, Holmes is entitled to qualified immunity, and summary judgment is warranted as to Plaintiffs' claims against her for denial of medical care.

*d.* *Supervisor Liability*

In addition to their claims against Sheriff Smith, Chief Hunter, and Chief Miller based on their individual actions, Plaintiffs assert that these Defendants are also liable based on a theory of supervisory liability. The Fifth Circuit has held that "[a] supervisory official may be held liable under section 1983 for the wrongful acts of a subordinate 'when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury.'" Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998) (citing Sims v. Adams, 537 F.2d 829, 831 (5th Cir. 1976)). However, contrary to Plaintiffs' assertions, "[u]nder section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir. 2005) (quoting Thompson v. Upshur Cnty., 245 F.3d 447, 459 (5th Cir. 2001) (further quotation omitted).

In order "[t]o establish § 1983 liability against supervisors, the plaintiff must show that: (1) the [supervisor] failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights." Id. (citing City of Canton, 489 U.S. at 378, 109 S. Ct. 1197; Burge, 336 F.3d at 370. However, "[w]here a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability." Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir. 2009) (citing Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 382 (5th Cir. 2005)).

Further, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, --- U.S. ---, 131 S. Ct. at 1360 (citing Bryan Cty., 520 U.S. at 409, 117 S. Ct. 1382). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id.

Plaintiffs do not attempt to establish such a pattern of violations by Eupora or Mathiston officers and rely instead only on conclusory allegations that Chief Hunter and Chief Miller were responsible for enforcing the municipalities' policies and procedures and that Chief Hunter and Chief Miller "had a duty to train their men and to supervise their men from not actively trying to break someone's neck." Plaintiffs fail to show how any particular deficiency in the training and supervision of officers by either Chief Hunter or Chief Miller resulted in the violation of Manus' constitutional rights. Further, Plaintiffs have failed to raise genuine issues of material fact as to whether Chief Hunter or Chief Miller acted with deliberate indifference to a "known or obvious consequence" of failing to train or supervise their officers. Brown, 219 F.3d at 457. Accordingly, summary judgment is appropriate with regard to Plaintiffs' claims against Chief Hunter and Chief Miller based upon for supervisory liability.

As to Sheriff Smith, Plaintiffs allege that he failed to supervise the jailers to ensure that they were responding to Manus' medical needs and failed to enforce Webster County's policies requiring jailers to fill out a medical intake sheet for each inmate. Webster County Jail Administrator Devin Mixon and Shay Holmes both testified that Sheriff Smith had to approve all requests for medical care by inmates. The Fifth Circuit considered similar allegations in Colle v. Brazos Cnty., Tex., 981 F.2d 237 (5th Cir. 1993). There, the plaintiffs alleged the defendant

sheriff had a policy of staffing the jail "with persons having no authority to transfer a seriously ill detainee to a hospital." Id. at 246. Additionally, the plaintiffs alleged the sheriff had a "policy of inadequate monitoring of pretrial detainees which amounted to a denial of medical care." Id. at 245. Though Colle involved the defendants' 12(b)(6) motion for dismissal, Id. at 239, the Fifth Circuit's holding is applicable to the case at bar. The Fifth Circuit the sheriff was not entitled to qualified immunity at the 12(b)(6) stage given that, if proven, the alleged policies at issue in Colle would be "constitutionally impermissible" and the sheriff "should have known that such a policy would result in the deprivation of a detainee's right to reasonable medical care." Id. at 246.

However, in the case at bar, Plaintiffs have failed to raise a genuine issue of material fact as to whether any County Defendant violated Manus' rights by acting with deliberate indifference in denying him medical care as a result of the policy requiring Sheriff Smith's approval in order to procure medical treatment for inmates.[14] See supra Section II(c). As such, Plaintiffs fail to establish any constitutional injury that might have been caused by Sheriff Smith's alleged policy or failure to train or supervise as required by the second element of supervisory liability. Roberts, 397 F.3d at 292. Thus, Sheriff Smith is entitled to qualified immunity, and summary judgment is also appropriate as to Plaintiffs' claims for supervisory liability against Sheriff Smith.

*e.* *Conspiracy*

Plaintiffs claim that Defendants conspired to intentionally break Manus' neck. However, Plaintiffs have offered no evidence that would create a genuine issue of material fact as to the existence of any such conspiracy to violate Manus' constitutional rights. "Plaintiffs who assert

---

[14] Though the Court has determined that Deputy Kilgore and Deputy May are not entitled to qualified immunity with regard to Plaintiffs' claims for denial of medical care, the allegations against them do not involve Manus' requests for medical care while in custody at the Webster County jail.

conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient." Lynch v. Cannatella, 810 F.2d 1363, 1369-70 (5th Cir. 1987) (citation omitted); see also Rodriguez v. Neeley, 169 F.3d 220, 222 (5th Cir. 1999) ("A conclusory allegation of conspiracy is insufficient."). In support of their conspiracy claim, Plaintiffs cite only the testimony of Dr. Huffman regarding a statement made by Deputy Kilgore, in the presence of other officers, that "we tried to break his . . . neck." This testimony alone is insufficient to create a genuine issue of material fact as to whether there was an agreement and if so, who was a party to it. See Arsenaux v. Roberts, 726 F.2d 1022, 1024 (5th Cir. 1982) ("To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act. The conspiracy allegations made by [Plaintiff] are conclusory, and more than a blanket of accusation is necessary to support a § 1983 claim."). As such, Defendants are entitled to summary judgment with regard to Plaintiffs' conspiracy claims.

### III. Municipal and County Liability under § 1983

Plaintiffs seek to recover from Webster County, Mississippi and the municipalities of Eupora and Mathiston, Mississippi. It is well settled law that municipal entities may be subject to liability under § 1983. Monell, 436 U.S. at 690, 98 S. Ct. 2018. However, the doctrine of *respondeat superior* cannot serve as the basis for such liability. Id. at 691, 98 S. Ct. 2018 (". . . Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor . . . ") (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically

have the force of law." Connick, ---- U.S. ----, 131 S. Ct. at 1359. In other words, a plaintiff must be able to show that his harm was caused by a violation of a constitutional right and that the municipal entity is itself responsible for the violation. Pembaur v. City of Cincinnati, 475 U.S. 469, 470, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

In the case at bar, Defendants argue that Plaintiffs cannot establish Monell liability against Eupora, Mathiston, or Webster County. They argue that Plaintiffs fail to identify any official policy or unofficial but widespread pattern or custom that caused Manus' injury. Further, County Defendants argue that Plaintiffs have failed to identify any official policymaker whose actions could serve as the basis for municipal liability against Webster County.

### a. *Eupora and Mathiston*

#### i. *Official Policy*

With regard to the cities of Eupora and Mathiston, Plaintiffs argue that both had official policies prohibiting the conduct alleged in Plaintiffs' Amended Complaint, which the individual officers failed to follow. Simply put, such allegations cannot serve as the basis for municipal liability. Rather, "[a] plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.'" Valle v. City of Houston, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002) (further citation omitted)). In order to show that a policy is the "moving force" behind a constitutional violation, "a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." James v. Harris Cnty., 577 F.3d 612, 617 (5th Cir. 2009) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 580 (5th Cir. 2001)).

Though the Fifth Circuit has held that the connection between the policy and the violation "must be more than a mere 'but for' coupling between cause and effect," Plaintiffs' argument could not meet even that lower burden. Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir. 1992). It simply cannot be said that the existence of policies *prohibiting* the conduct alleged, in fact *directly caused* that same conduct and, as a result, the alleged injury to Manus. Rather, it is clear that Plaintiffs attempt to impose liability on the cities of Eupora and Mathiston based upon a theory of *respondeat superior*, an avenue foreclosed by the Supreme Court in Monell. 436 U.S. at 691, 98 S. Ct. 2018 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original).

## ii. Failure to Train/Supervise

Plaintiffs also argue that the cities of Eupora and Mathiston are liable because they "had a duty to train and supervise the officers not to act intentionally to break Manus' neck." Plaintiffs further contend that "Chief Hunter and Chief Miller had a duty to train their men and to supervise their men from not actively trying to break someone's neck" and that "[n]o one bothered to make sure the officers were trained to act in compliance with the policies and procedures or supervised to make sure they acted in compliance with the policies and procedures."

The Supreme Court and the Fifth Circuit have recognized that "[t]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." Brown v. Bryan Cnty., OK, 219 F.3d 450, 457 (5th Cir. 2000) (quoting City of Canton v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). However, "[a] municipality's culpability for a deprivation of

rights is at its most tenuous where a claim turns on a failure to train." <u>Connick</u>, --- U.S. ---, 131 S. Ct. at 1359. "Plaintiffs seeking to win under this theory must first prove a direct causal link between the municipal policy and the constitutional deprivation; they then must establish that the city consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens." <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 795-96 (5th Cir. 1998) (quoting <u>City of Canton</u>, 489 U.S. at 389, 109 S. Ct. 1197).

As the Court has explained, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." <u>Connick</u>, --- U.S. ---, 131 S. Ct. at 1360 (citation omitted). However, Plaintiffs concede that municipal liability cannot be established based upon a pattern, practice, or custom of either Eupora or Mathiston. Specifically, Plaintiffs state that they have "not attempted to develop a pattern or custom through other persons as the pattern was only perfected repetitiously against Manus." Whereas Plaintiffs do not allege any prior incidents of misconduct by Municipal Defendants against Manus, the Court must assume the pattern "perfected repetitiously against Manus" refers only to the alleged actions of the officers during the single incident at issue in this matter.

Though, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which [a municipality] may be liable," <u>Brown</u>, 219 F.3d at 462, "this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." <u>Valle</u>, 613 F.3d at 542 (citing <u>Bolton v. City of Dallas</u>, 541 F.3d 545, 548 (5th Cir.2008) (further citation omitted). Plaintiffs have failed to establish any genuine issues of material fact concerning a failure to train or supervise by Chief Hunter or Chief Miller. <u>See</u> <u>supra</u> <u>Section II(d)</u> regarding supervisor liability. Whereas Plaintiffs have

failed to allege any specific deficiencies in the training programs or supervision of Eupora or Mathiston officers, the Court finds the municipalities of Eupora and Mathiston are not liable under <u>Monell</u> for failure to train or supervise.

*iii.*   *Official Policymaker*

Federal district courts in Mississippi have held chiefs of police to be final policymakers over municipalities' law enforcement functions. <u>See</u> <u>Moore v. City of Columbus</u>, 2012 WL 2562841, at *2 (N.D. Miss. June 29, 2012); <u>Taylor v. Town of DeKalb, Miss.</u>, 2009 WL 1748523, at *4 (S.D. Miss. June 19, 2009); <u>see</u> <u>also</u> MISS. CODE. ANN. § 21-21-1. Accordingly, whereas the Court has determined that genuine issues of material fact exist with regard to whether Chief Hunter may be liable as a bystander for Plaintiffs' claims of excessive force in violation of the Fourth Amendment and for the denial of medical care, the municipality of Eupora may also be liable. Similarly, given that Municipal Defendants concede that genuine issues of material fact exist as to whether Chief Miller may be liable for the use of excessive force, as well as bystander liability, and as the Court has determined that Chief Miller is not entitled to qualified immunity with regard to Plaintiffs' claims for denial of medical care, the municipality of Mathiston may also be liable. Thus, summary judgment is improper as to Plaintiffs' claims against Eupora and Mathiston for excessive force and denial of medical care based upon the actions of Chief Hunter and Chief Miller.

*b.*   <u>*Webster County*</u>

*i.*   *Official Policy*

With regard to Webster County, Plaintiffs again identify official policies that they claim prohibited the alleged conduct of the individual officers. Specifically, Plaintiffs' claim the Standard Operating Procedures adopted by the Webster County Board of Supervisors and Sheriff

Smith required an officer to call an ambulance anytime the officer encountered a person who was "bleeding, nauseated, dazed or unconscious." Plaintiffs, however, argue that another Webster County policy, requiring jailers to obtain permission from Sheriff Smith before releasing an inmate to a hospital for medical treatment, contradicted the Standard Operating Procedures and caused the alleged denial of medical treatment by the individual County Defendants.

In the factually similar case of Colle v. Brazos Cnty., Tex., the Fifth Circuit, in discussing municipal liability based upon the sheriff's policies, held that "the ultimate jury question in this case is whether Brazos County adopted policies creating an obvious risk that pretrial detainees' constitutional rights would be violated." Colle v. Brazos Cnty., Tex., 981 F.2d 237, 246 (5th Cir. 1993). However, Colle addressed the issue of municipal liability in the context of a 12(b)(6) motion to dismiss. The Fifth Circuit has held that in order to establish liability under § 1983 against a municipal entity for a denial of medical care: "a plaintiff must show (1) that a municipal employee acted with subjective deliberate indifference to violate clearly established constitutional rights; and (2) 'that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'" Frank v. Police Dep't City of Eunice, 244 F.3d 137, 137 (5th Cir. 2000) (quoting Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999)).

Whereas the Court has determined that Plaintiffs failed to raise a genuine issue of material fact as to whether any individual County Defendant acted with deliberate indifference in denying Manus medical care during his confinement at the Webster County jail, Webster County's policies regarding inmate medical care cannot serve as the basis for imposing liability against Webster County. Thus, summary judgment is proper with regard to Plaintiffs' claims against Webster County for denial of medical care.

In addition to their argument that Webster County is liable because of its policy requiring the sheriff's authorization for inmate medical care, Plaintiffs argue that Webster County inadequately trained its jailers regarding its Standard Operating Procedure policy for medical care and/or how to deal with medical emergencies and that this failure to train caused the denial of medical care to Manus. Again, because the Court has determined that summary judgment is proper as to Plaintiffs' claims for denial of medical care while Manus was in custody at the Webster County jail, Plaintiffs have likewise failed to show a constitutional violation for which Webster County's alleged failure to train its jailers regarding its medical treatment policies might be the moving force.

Additionally, Plaintiffs offer only conclusory allegations regarding their excessive force claim against Webster County, stating:

> The issue here is whether Defendant County or Sheriff trained the officers not to beat an arrestee with a bat. And whether he supervised the attack and did not instruct them to stop or not to participate. The fact that the officers conspired to break Manus' neck indicates a lack of training and supervision.

Plaintiffs' broad, conclusory allegation of a conspiracy, absent record evidence, does not support their claims for failure to train or supervise. Additionally, as with Plaintiffs' allegations against the cities of Eupora and Mathiston, Plaintiffs fail to show that there was an obvious need to train its officers not to "beat an arrestee with a bat." Again, Plaintiffs fail to identify any specific deficiencies in Webster County's training of its officers and admit that "County Defendants provided documentation of adequate training regarding use of excessive force, but they failed to adhere to their training on September 7, 2010." As with their claims against the cities of Eupora and Mathiston, Plaintiffs' allegations are based merely on the doctrine of *respondeat superior*

and are thus insufficient to impose liability on Webster County. Summary judgment is proper as to Plaintiffs' claims against Webster County for failure to train.

Further, with regard to Plaintiffs' claim that Webster County is liable for Sheriff Smith's failure to supervise and stop his officers from using excessive force against Manus, the Court finds that Plaintiffs have failed to demonstrate that the officers were unsupervised, much less that their alleged actions were a highly predictable consequence of a failure to supervise. Moreover, the Fifth Circuit "ha[s] stressed that a single incident is usually insufficient to demonstrate deliberate indifference." Estate of Davis, 406 F.3d at 382. "Claims of inadequate supervision and claims of inadequate training both generally require that the plaintiff demonstrate a pattern." Id. at n.34. Accordingly, summary judgment is warranted as to Plaintiffs' claims against Webster County for failure to supervise.

### iii. Official Policymaker

Defendants also argue that Plaintiffs fail to identify an official policymaker whose actions could serve as a basis for imposing liability against Webster County. However, the Fifth Circuit has recognized that "[s]heriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties." Brooks v. George Cnty., Miss., 84 F.3d 157, 165 (5th Cir. 1996). "[A] final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." Bryan Cnty., 520 U.S. at 406, 117 S. Ct. 1382 (citing Pembaur, 475 U.S. at 481, 106 S. Ct. 1292). As the Supreme Court has explained:

> [P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself

violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Id. at 405, 117 S. Ct. 1382.  As explained in detail *supra*, a genuine issue of material fact exists as to whether Smith used excessive force in arresting Manus that was objectively unreasonable in light of the clearly established law at the time of the incident.  Further, genuine issues of material fact exist as to whether May and Miller used excessive force against Manus at a time when Smith was indisputably present.  Additionally, the Court has determined that Sheriff Smith is not entitled to qualified immunity with regard to Plaintiffs' claim for denial of medical care.  Thus, as a final policymaker for Webster County, if Smith is found to be liable for Plaintiffs' claims of excessive force, bystander liability, and/or denial of medical care, then Webster County would likewise be liable.  As such, summary judgment is not appropriate as to Plaintiffs' claims against Webster County for excessive force and denial of medical care based upon the actions of Smith.

## IV.     State Law Claims

In addition to their federal law claims, Plaintiffs' assert Defendants are liable for the following claims in violation of Mississippi law:  malicious prosecution, malicious abuse of process, violation of the Mississippi Tort Claims Act, false arrest and imprisonment, assault, battery, conspiracy, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, violation of state constitutional rights, and wrongful death claims.  Defendants contend Plaintiffs' claims are barred by the Mississippi Tort Claims Act ("MTCA").

### *a.     Violation of State Constitutional Rights*

Municipal Defendants argue that Plaintiffs' claims for violations of Manus' rights under the Mississippi Constitution must be dismissed because all civil claims against government entities and employees must be brought under the MTCA.  Indeed, as another federal district court sitting in Mississippi noted, "[t]he MTCA provides the exclusive civil remedy against a

governmental entity and its employees for acts or omissions which give rise to a suit. Any claim filed against a governmental entity and its employees must be brought under this statutory scheme." Gilmore v. Fartheree, 3:10-CV-00267-DPJ, 2011 WL 6026121 (S.D. Miss. Dec. 2, 2011) (quoting Lang v. Bay St. Louis/Waveland Sch. Dist., 764 So. 2d 1234, 1236 (Miss.1999)); see also City of Jackson v. Sutton, 797 So. 2d 977, 979 (Miss.2001) (barring plaintiffs' state-constitutional claims due to exclusivity of MTCA); Miss.Code Ann. § 11-46-7(1). Accordingly, Plaintiffs' claims for violations of Manus' state constitutional rights must be dismissed.

### b. Malicious Prosecution and Abuse of Process

Both Municipal and County Defendants contend Plaintiffs' claims for malicious prosecution and abuse of process fail on the merits. In responding to Defendants' motions, Plaintiffs attempt to raise genuine issues of material fact based on two events: the initial arrest of Manus and an assault charge filed against Manus as a result of the events of September 7, 2010.

The Court initially notes that under Mississippi law, malicious prosecution and abuse of process are treated as separate causes of action. State for Use & Benefit of Foster v. Turner, 319 So. 2d 233, 236 (Miss. 1975) ("While some cases have confounded the action for abuse of process with the action for malicious prosecution, the two are essentially different and independent."). To recover in an action for malicious prosecution, "a plaintiff must show (1) the institution of a criminal proceeding; (2) by, or at the instance of, the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the plaintiff's suffering of injury or damage as a result of the prosecution." Strong v. Nicholson, 580 So. 2d 1288, 1293 (Miss. 1991) (citations omitted).

Plaintiffs offer no evidence of any criminal proceeding instituted at the instance of any Municipal Defendant. Thus, summary judgment is appropriate with regard to Plaintiffs' claim of

malicious prosecution against them. Similarly, with regard to County Defendants, Plaintiffs argue only that Deputy Kilgore filed assault charges against Manus for the purpose of "keeping him in jail to cover up his wrongful acts." Plaintiffs offer no evidence of any criminal proceeding instituted by any other County Defendant, and therefore, summary judgment is also merited as to Plaintiffs' claims against them for malicious prosecution.

With regard to Deputy Kilgore, Judge Ellison testified in her deposition that she conducted initial appearance proceedings for Manus on charges of resisting arrest and aggravated assault on a police officer stemming from the events of September 7, 2010. Additionally, Defendants offer into the summary judgment record Deputy Kilgore's arrest report, which states that Manus was charged with resisting arrest and aggravated assault on a law enforcement officer. Plaintiffs claim that Deputy Kilgore did not pursue the charges and is liable for malicious prosecution. The Mississippi Supreme Court has held that "[t]he termination requirement is met when the action is either abandoned by the prosecuting attorney or by the complaining witness." Id. (Royal Oil Co., Inc. v. Wells, 500 So. 2d 439, 443 (Miss. 1986) (citing cases)). However, Plaintiffs offer no evidence to support their assertion that Deputy Kilgore abandoned the charges against Manus. The record is silent as to the resolution of these charges, and as such, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact with regard to the third element of their claim for malicious prosecution. Accordingly, summary judgment is merited as to Deputy Kilgore.

As to Plaintiffs' claims for abuse of process, "the three elements of abuse of process are: (1) the party made an illegal use of a legal process, (2) the party had an ulterior motive, and (3) damage resulted from the perverted use of process." Ayles ex rel. Allen v. Allen, 907 So. 2d 300, 303 (Miss. 2005). The Mississippi Supreme Court "has stated that the crucial element of this tort

is the intent to abuse the privileges of the legal system. Id. (citing McLain v. West Side Bone & Joint Ctr., 656 So.2d 119, 123 (Miss. 1995)). Plaintiffs argue that Defendants are liable for an abuse of process because they arrested Manus without a proper bond revocation order. However, this allegation does not support an action for abuse of process but rather restates Plaintiffs' argument relating to their claims for false arrest. As such, Plaintiffs have failed to raise a genuine issue of material fact with regard to their claims for abuse of process, and thus, summary judgment is proper.

### c. Miss. Code § 11-46-9(1)(c)

County and Municipal Defendants additionally contend that Manus' state law claims based upon his arrest are barred by the MTCA because Manus was engaged in criminal activity at the time of his arrest. Pursuant to § 11-46-9(1)(c) of the Mississippi Code:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

Defendants contend Manus resisted a lawful arrest and failed to obey the lawful orders of law enforcement officers. Under Mississippi law, it is unlawful "for any person to obstruct or resist by force, or violence, or threats, or in any other manner, his lawful arrest . . . by any state, local or federal law enforcement officer . . . ." MISS. CODE. ANN. § 97-9-73. However, the Court has determined that a genuine issue of material fact exists as to whether Manus was resisting the officers. See supra Section II(b). Likewise then, a genuine issue of material fact exists as to whether or not Manus was engaged in conduct that would violate § 97-9-73, and thus, summary judgment is not appropriate.

In the alternative, Defendants argue that, even if Manus was not engaged in criminal activity, Defendants did not act with reckless disregard. "[R]eckless disregard is more than mere negligence, but less than an intentional act." <u>Scott v. City of Goodman</u>, 997 So. 2d 270, 276 (Miss. Ct. App. 2008). The Mississippi Supreme Court has explained that the term "reckless disregard," construed in the context of § 11-46-9(1)(c), "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." <u>Turner v. City of Ruleville</u>, 735 So. 2d 226, 230 (Miss. 1999). "Similar to an excessive force claim under § 1983, the determination of whether there was reckless disregard will depend upon the circumstances surrounding the incident that caused the injury.") <u>Buchanan v. Gulfport Police Dep't</u>, 2012 WL 1906523, at *12 (S.D. Miss. May 25, 2012) (citing <u>Scott v. City of Goodman</u>, 997 So. 2d 270, 277 (Miss. Ct. App. 2008)) <u>aff'd</u>, 530 F. App'x 307 (5th Cir. 2013).

Manus testified that Sheriff Smith hit him twice in the back of the neck with a bat while he was handcuffed and compliant. Also, Manus testified that Deputy May tased him while he was handcuffed, lying on the ground, and compliant. Further, Manus testified that Chief Miller sprayed him in the face with pepper spray while he was handcuffed and compliant. Manus additionally testified that Officer Jackson slammed him against the walls and bars inside the Webster County jail when he escorted Manus to his cell. Again, Manus testified that he was handcuffed and compliant throughout. The Court finds that Plaintiffs have raised a genuine issue of material fact as to whether such conduct constitutes reckless disregard. <u>See</u> <u>City of Jackson v. Powell</u>, 917 So. 2d 59, 72 (Miss. 2005) (finding officers' actions constituted reckless disregard where force applied for a period of time after plaintiff was subdued and handcuffed and "apparently offering no resistance at all."). Thus, Sheriff Smith, Deputy May, Chief Miller, and

Officer Jackson are not immune from Plaintiffs' claims under Mississippi Code § 11-46-9(1)(c) and summary judgment is not proper.

However, "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties," even though joined in a representative capacity. City of Jackson v. Brister, 838 So. 2d 274, 278 (Miss. 2003). Under the MTCA, "an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense." MISS. CODE ANN. § 11-46-7(2) (emphasis added). Accordingly, these Defendants are not personally liable for their acts committed with reckless disregard. Instead, Webster County, Eupora, and Mathiston are potentially liable for Plaintiffs' claims.

Further, as Plaintiffs have failed to show that Officer Box either participated in or witnessed the alleged attack on Manus, or was in anyway involved in Manus' medical treatment, the Court finds that Plaintiffs have failed to establish any conduct attributable to Officer Box that might be classified as reckless disregard. Thus, Officer Box is entitled to immunity under the police exception to the MTCA. MISS. CODE ANN. § 11-46-9(1)(c).

With regard to all other Defendants, the Court finds that additional factual development afforded through trial is needed to determine whether their alleged acts and omissions constituted reckless disregard such that they would not be immune under § 11-46-9(1)(c), and summary judgment is therefore not appropriate with regard to Plaintiffs' claims against the remaining Defendants arising from Manus' arrest.

County Defendants additionally argue that Plaintiffs' state law claims against them based upon denial of medical care are barred by the MTCA. Pursuant to § 11-46-9(1)(m) of the Mississippi Code:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed.

Further, for purposes of the MTCA:

> an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

Miss. Code. Ann. § 11-46-7(2). Thus, Defendants are immune from Plaintiffs' claims arising while Manus was in custody at the Webster County jail unless the Defendants' actions constituted "fraud, malice, libel, slander, defamation or any criminal offense." Id.[15] Accordingly, to the extent that Plaintiffs' state law claims based on Defendants' acts or omissions within the course and scope of employment and arising while Manus was in custody, County Defendants are immune pursuant to § 11-46-9(1)(m), and summary judgment is appropriate.

---

[15] Both County Defendants and Plaintiffs cite Sparks v. Kim, 701 So. 2d 1113, 1117 (Miss. 1997) for the proposition that the so-called "inmate exemption" does not apply to prison officials who commit "willful wrongs or malicious acts." However, this is not the holding of Sparks. Rather, the Mississippi Supreme Court held that the claims in Sparks arose prior to the effective date of § 11-46-9(1)(m) and therefore the "inmate exemption" did not apply. Id. at 1114-1115. However, the court held that qualified public official immunity still applied to protect prison doctors and other prison medical personnel for medical treatment decisions unless they commit "willful wrongs or malicious acts." Id. at 1117. The court limited its decision to the very narrow class of claims arising before the effective date of § 11-46-9(1)(m). Id. at 1116 ("To the extent that the Legislature has enacted its own statutory provisions limiting the ability of prisoners to file lawsuits such as the present one, said statutory law is, of course, controlling from and after the effective date thereof.").

Finally, the Court addresses Plaintiffs' claims for wrongful death pursuant to § 11-7-13 of the Mississippi Code. County Defendants contend that Plaintiffs' wrongful death claims are barred by the MTCA's "inmate exemption." See Miss. Code. Ann. § 11-46-9(1)(m).   The Mississippi Supreme Court has held that where § 11-46-9(1)(m) would have barred the claims of the decedent had he survived, the claims of his wrongful death beneficiaries are likewise barred. Webb v. DeSoto County, 843 So. 2d 682, 684-85 (Miss. 2003; Carter v. Mississippi Dep't of Corr., 860 So. 2d 1187, 1192 (Miss. 2003).  Thus, as the Court explained *supra*, to the extent that Plaintiffs' wrongful death claims based on Defendants' acts or omissions within the course and scope of employment and arising while Manus was in custody, County Defendants are immune pursuant to § 11-46-9(1)(m), and summary judgment is appropriate.

Further, County Defendants argue that Lois Manus lacks standing to bring claims under Mississippi's wrongful death statute.  County Defendants argue that Manus' widow, Miranda Manus, is a surviving statutory beneficiary of the first degree, and that as such, she has the sole right to bring suit under the statute. See Miss. Code Ann. § 11-7-13.  County Defendants contend that Lois Manus is a surviving statutory beneficiary of the second degree, and is thus precluded from bringing any claims for wrongful death. Id.

Plaintiffs state in their Amended Complaint that "Miranda Manus and Lois Manus on behalf of all wrongful death beneficiaries of Joseph Conway Manus . . . files this Amended Complaint."  Despite this language, Plaintiffs contend that County Defendants' arguments relating to Lois Manus are moot because "Lois Manus is not pursuing an independent wrongful death claim against the Defendants.  Lois is only serving as the Co-Executrix of the Estate of Joseph Conway Manus."  Plaintiffs additionally state that "[t]he only Plaintiffs in this matter

who are pursuing wrongful death claims against the Defendants are decedent Conway Manus' wife, Miranda Manus, and their two minor children." Thus, the Court deems any wrongful death claim brought by Lois Manus to have been abandoned.

## CONCLUSION

For the foregoing reasons, the Court finds the following claims survive Defendants' motions for summary judgment:

- Unlawful search and seizure by Deputy Kilgore and Deputy May in their personal capacities;

- Use of excessive force in violation of the Fourth Amendment by Sheriff Smith and Deputy May, in their individual capacities; Chief Miller, in his individual and official capacities; Officer Jackson, in his individual capacity;[16] Webster County, Eupora, and Mathiston;

- Denial of medical care in violation of the Fourteenth Amendment by Sheriff Smith, Deputy Kilgore, and Deputy May, in their individual capacities; Officer Crenshaw, in his individual capacity; Chief Hunter and Chief Miller, in their individual and official capacities; Webster County, Eupora, and Mathiston

- State law claims based on Defendants' acts in reckless disregard relating to the arrest of Manus, with the exception of Officer Box who the Court has found to be immune pursuant to the MTCA;

---

[16] Though Municipal Defendants did not specifically move for summary judgment as to Plaintiffs' official capacity claims against the individual Municipal Defendants, the Court has determined that Eupora and Mathiston are only liable based upon the actions of Chief Hunter and Chief Miller, the municipalities' final policymakers. Whereas claims against officers in their official capacities are essentially claims against the municipal entity, Kentucky v. Graham, 473 U.S. at 166, 105 S. Ct. 3099, the Court finds Plaintiffs' claims against Officer Crenshaw, Officer Jackson, and Officer Box in their individual capacities must be dismissed.

- State law claims based on County Defendants' acts or omissions not within the course and scope of employment and not arising while Manus was in custody; AND

- State wrongful death claims brought by Miranda Manus on behalf of all wrongful death beneficiaries, based on Defendants' acts or omissions not within the course and scope of employment and not arising while Manus was in custody.

All other claims are dismissed with prejudice. A separate order to that effect shall issue this day.

## MOTION TO STRIKE

Municipal Defendants' filed their Motion to Strike Errata Sheets [170], to which County Defendants have joined [172]. Defendants move the Court to strike the proposed corrected deposition testimony of Joseph Conway Manus and Lois Manus on the basis that "the changes are directed specifically at defeating summary judgment for certain of the defendants." However, the errata sheets at issue were not made a part of the record of any dispositive motion. Accordingly, the Court finds Defendants' motion is MOOT. In the event that any party attempts to introduce such corrected testimony at trial, Defendants may renew their motion at that time.

## MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS

Federal Rule of Evidence 702 allows testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education" if such testimony will assist the trier of fact and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Under the Federal Rules of Evidence, the trial court must ensure that any and all testimony or evidence is not only relevant, but reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Subsequently, in <u>Kumho Tire, Co., Ltd. v. Carmichael</u>, the Supreme Court expanded the <u>Daubert</u> "gatekeeping" obligation of the trial court to apply not only to testimony based on "scientific" knowledge, but also "technical" and "other specialized" knowledge. 526 U.S. 137, 141, 147–48, 119 S. Ct. 1167, 143 L. Ed. 2d 238. The Supreme Court stated that <u>Daubert's</u> list of specific factors neither necessarily nor exclusively apply to every case. <u>Id.</u> at 150–51, 119 S. Ct. 1167. Instead, trial courts enjoy "broad latitude" when deciding how to determine reliability. <u>Id.</u> at 151–53, 119 S. Ct. 1167. The gatekeeping function must be tied to the particular facts of the case. <u>Id.</u> at 149–51, 119 S. Ct. 1167. Further, the Fifth Circuit has held that "[m]ost of the safeguards provided for in <u>Daubert</u> are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." <u>Gibbs v. Gibbs</u>, 210 F.3d 491, 500 (5th Cir. 2000).

## I.     Ron Crew and John Tisdale

Municipal Defendants have also filed a Motion to Exclude Plaintiffs' Expert Ron Crew [166] and Motion to Exclude Plaintiffs' Expert John Tisdale [168]. Plaintiffs offer both Crew and Tisdale as experts in "law enforcement training and procedure." Defendants contend that the opinions of both experts should be excluded on the basis that they constitute impermissible conclusions of law and are based on speculation and incomplete or incorrect facts.

Rule 704 abolished "the per se rule against testimony regarding ultimate issues of fact," but it did "not open the door to all opinions." <u>Owen v. Kerr–McGee Corp.</u>, 698 F.2d 236, 239–40 (5th Cir. 1983). The rule is not intended to "allow a witness to give *legal* conclusions." <u>Id.</u> at 240 (citing <u>United States v. Fogg</u>, 652 F.2d 551, 557 (5th Cir. 1981), <u>cert. denied</u>, 456 U.S. 905, 102 S. Ct. 1751, 72 L. Ed. 2d 162 (1982); <u>United States v. Milton</u>, 555 F.2d 1198, 1203 (5th Cir.

1977)). "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." Id.

Both Crew and Tisdale include many statements that may properly be characterized as impermissible legal conclusions.[17] Accordingly, the Court finds that Defendants' motions shall be GRANTED IN PART with regard to all such irrelevant testimony. However, both Crew and Tisdale also offer testimony relating to law enforcement training, model policies, and standards. The Court finds such testimony is relevant to the determination of the issues on summary judgment and thus DENIES IN PART Defendants' motions to exclude to the extent that Crew and Tisdale offer testimony relevant to Plaintiffs' claims for failure to train and supervise.

## II.    Dr. Erin Barnhart and James Wells

Defendants additionally seek to exclude the opinions of Dr. Erin Barnhart, a Medical Examiner at the Mississippi State Medical Examiner's Office, as to the cause and manner of Manus' death, Dr. Barnhart's affidavit, and the autopsy report on the basis that they are not based on reliable principles and methodology as required by Daubert. Similarly, Defendants seek to exclude the death certificate of Manus and any testimony regarding the same, including that of James Wells, the Webster County Medical Examiner Investigator. Whereas the Court analyzes *infra* Plaintiffs' claims against Defendants for excessive force and denial of medical care in light of the objective reasonableness of Defendants' alleged conduct pursuant to qualified immunity, the Court need not rely upon the testimony of Dr. Barnhart or James Wells in deciding the motions for summary judgment. However, for purposes of trial, the Court finds that a hearing on the issues is required to determine whether the proffered testimony of Dr. Barnhart

---

[17] E.g., "Webster County employees Smith, Kilgore, and Mays violated Manus' 4th Amendment rights to unreasonable search and seizure. . . ." "Smith, May, Kilgore, Webster County, Hunter, Crenshaw, Eupora Police Department, Miller, and Mathiston violated Conway Manus' fourth and fourteenth Amendment rights for unlawfully searching the bedroom . . . ."

and Mr. Wells, together with the documents Defendants also seek to exclude, meet the requirements set forth by <u>Daubert</u>. Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to exclude Dr. Barnhart, James Wells, and related documents.

SO ORDERED, this the 31st day of March, 2014.

  /s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE