**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

THE ESTATE OF                                                                                    PLAINTIFFS
JOSEPH CONWAY MANUS, et al.

V.                                                      CIVIL ACTION NO. 1:11-CV-00149-SA-DAS

CITY OF EUPORA, MISSISSIPPI, et al.                                             DEFENDANTS

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiffs filed this action, asserting constitutional claims brought through 42 U.S.C. § 1983, as well as various state law claims. This case has been extensively litigated, including several dispositive motions. Rulings in those individual motions narrowed the issues substantially from its original filing. The Court subsequently commenced a four day bench trial on August 18, 2014. Following a thorough review of the evidence and applicable law, the Court is prepared to rule.

*Procedural History*

Joseph Conway Manus ("Manus") originally brought this action, alleging that on September 7, 2010 law enforcement officers from Webster County, Mississippi; Eupora, Mississippi; and Mathiston, Mississippi used excessive force against him in order to effectuate an unlawful arrest and denied him medical care during the seven days that he was in their custody. As a result, Manus claimed he suffered serious injuries, including quadriplegia. Manus died on December 1, 2012 while this lawsuit was pending.

After his death, Manus' widow, Miranda Manus, acting on her own behalf, as well as with Manus' mother, Lois Manus, on behalf of all wrongful death beneficiaries, and Manus' estate were substituted as Plaintiffs. Plaintiffs filed an Amended Complaint [249] adding claims for wrongful death on June 6, 2013. All Defendants filed motions for summary judgment,

asserting, among other things, that Plaintiffs' claims were barred by the doctrines of qualified immunity and the Mississippi Tort Claims Act. The Court granted in part and denied in part these motions in its Order [324] and Memorandum Opinion [325] entered March 31, 2014.

Thereafter, Eupora Police Chief Gregg Hunter, the estate of Eupora Police Officer Keith Crenshaw,[1] and the city of Eupora filed a Motion for Reconsideration [327] requesting the Court reconsider its finding that genuine issues of material fact precluded the grant of summary judgment and qualified immunity in their favor with regard to Plaintiffs' claims against them for excessive force bystander liability and for the denial of medical care. The Court declined to reconsider [338] its prior opinion with regard to Plaintiffs' claims against these Defendants for excessive force bystander liability and Plaintiffs' claims against Chief Hunter and the city of Eupora for deliberate denial of medical care. However, the Court reversed its finding with regard to Plaintiffs' claim for deliberate denial of medical care against Officer Crenshaw and dismissed that claim with prejudice.

Subsequently, Plaintiffs reached a settlement agreement with Webster County and the individual County Defendants, and the Court entered an Order [350] dismissing Plaintiffs' claims against these Defendants without prejudice on July 31, 2014.

*Allegations at Issue*

As stated in the Pretrial Order [379], Plaintiffs' claims remaining at trial included:

- Use of excessive force in violation of the Fourth Amendment by Eupora Police Officer Mitch Jackson, in his individual capacity, Mathiston Police Chief Roger Miller, in his individual and official capacities, and the city of Mathiston;

---

[1] Officer Crenshaw died on October 23, 2013. His estate has been substituted as a party defendant.

- Liability as a bystander to excessive force in violation of the Fourth Amendment by Chief Hunter and Chief Miller, in their individual and official capacities, Officer Crenshaw, in his individual capacity, and the cities of Eupora and Mathiston;

- Denial of medical care in violation of the Fourteenth Amendment by Chief Hunter and Chief Miller, in their individual and official capacities, and the cities of Eupora and Mathiston;

- State law claims based on the individual Defendants' acts in reckless disregard relating to the arrest of Manus;

- State wrongful death claims brought by Miranda Manus on behalf of all wrongful death beneficiaries, based on the individual Defendants' acts or omissions not within the course and scope of employment and not arising while Manus was in custody.[2]

*Findings of Fact*

On the afternoon of September 7, 2010, Webster County Sheriff's Deputies Derek May and Jeremy Kilgore entered the home of Joseph Conway Manus and attempted to take him into custody.[3] When they entered the residence, they found Manus located in a bedroom at the end of a hallway with the door shut, refusing to come out. After Kilgore threatened to kick it down, Manus opened the bedroom door and Kilgore shot at him with his taser. Kilgore testified that he saw a knife in Manus' hand and that he fell over a bed in a room across the hallway while attempting to retreat from Manus, who was undeterred by the taser. Manus also testified in his

---

[2] At trial, Plaintiffs abandoned their use of excessive force claims against Chief Miller and the city of Mathiston and their bystander excessive force claim against Officer Crenshaw.

[3] As discussed in more detail below, both May and Kilgore had previously arrested Manus and testified that Manus had resisted and failed to comply with orders. May testified that, on this particular instance, they had been instructed by Webster County Sheriff Phillip Smith to bring Manus into custody because he had recently been released from a court-ordered drug rehabilitation program and should have been returned to the custody of Webster County under a revoked bond. Plaintiffs initially brought claims of unlawful arrest against Defendants, but the Court found at summary judgment that the individual Defendants were entitled to qualified immunity and dismissed those claims.

deposition that Kilgore tripped and fell over the bed but claimed that he did so when he initially reached for his taser and that he did not know why Kilgore tased him. Both Manus and Kilgore testified that Manus then retreated to the original bedroom and shut the door.

Kilgore testified that he told Deputy May to call for backup. Though he disputed having actually had a knife, Manus himself admitted that the officers believed he had a knife and that that was the reason they called for backup. Manus remained in the bedroom while the officers awaited assistance.

Webster County Sheriff Phillip Smith was the first officer to respond to the call for assistance and arrived on scene in his personal vehicle. Smith took a bat from the bed of his truck and entered the Manus' residence. Smith testified that he took the bat in case he needed it to gain entry into the home but that he dropped it near the front door once he was able to enter the house without it. Mathiston Police Chief Roger Miller testified that he arrived as Smith was entering the house and that he saw Smith carrying a bat. Likewise, May testified that Smith was carrying a bat when he exited his vehicle and approached the house. Kilgore testified that he thought Smith put the bat down when Kilgore told him that he would be able to kick in the bedroom door.

Kilgore told Manus to open the bedroom door and, when Manus failed to comply, Kilgore kicked it down. At this point, the narratives of Plaintiffs and Defendants greatly diverge. The testimony at trial established that an altercation occurred between Manus and the officers wherein Manus was maced by Miller, tased by May, and restrained on the floor. Beyond these basic facts, the testimony was largely inconsistent. Manus testified that he was sitting in a chair in the bedroom when the officers kicked down the door. He claimed that he stood up and the officers turned him around and placed him in handcuffs. Then, according to Manus, Smith

struck him in the back of the neck with the bat twice, causing him to fall to the floor. Manus claims that Kilgore fell to the floor with him, cutting his head on a jar knocked off a dresser by Smith. Manus testified that Smith dropped down on Manus' neck with his knee, May tased him, and Miller maced him, all while he was handcuffed with his hands behind his back on the floor and not resisting. Manus testified that the officers then stood him up, escorted him out of the house into a patrol car, and transported him to the Webster County jail.

According to Kilgore, however, when he kicked the door down, Manus rushed out into the hallway and lunged at him, pushing him into a third bedroom. Kilgore testified that he grabbed Manus around the waist and pushed him back into the hallway, where Miller maced Manus and May tased him in an attempt to stop him from resisting. Kilgore testified that he then pushed Manus into the original bedroom and tripped him to the floor on his back. Kilgore testified that, as they entered the bedroom, he was hit hard on the head and heard glass shatter. Kilgore claimed Manus continued to resist the officers, hiding his arms under his body so that the officers could not place him in handcuffs, so May tased Manus again on the leg. According to Kilgore, once he and either Smith or May were finally able to put Manus in handcuffs, the officers stood him up and escorted him outside.

Similarly, May testified that Manus rushed out into the hallway after Kilgore kicked down the door and that he shot him with his taser. May also testified that Kilgore grabbed Manus around the waist and that Manus, Kilgore, and Smith moved back into the original bedroom. May claims that when he followed them into the room, Manus was face down on the floor with his hands underneath his body and that Kilgore was on his left, Smith was on his right, Miller was holding his right leg, and May held his left leg. May testified that Manus continued

resisting, so he tased Manus high on his left leg. May testified that he handcuffed Manus and the officers then escorted him out.

Smith also testified that Manus came out into the hall once Kilgore kicked down the bedroom door and that he heard glass break. Smith claimed that he grabbed Manus' left side and that he, Manus, and Kilgore went back into the original bedroom, where he and Kilgore took Manus to the ground. Smith testified that Manus was initially on his back, with Smith holding his left arm, May somewhere at Manus' feet, and Kilgore also in the room. Smith stated that he wasn't sure if Miller actually entered the room but that he sprayed them all with mace from somewhere at their feet. Smith claimed that Manus eventually wound up face down and gave the officers his hands after Miller sprayed them with mace. At that point, according to Smith, the officers were able to handcuff Manus, stand him up, and walk him out.

For his part, Miller testified that, after the door was kicked in, he saw Manus rush out into the hall and push Kilgore into another bedroom. Miller claimed he saw Kilgore, Smith, and May fighting Manus in the hall and that he maced Manus because the other officers were not able to contain him. According to Miller, the officers and Manus then went back into the original bedroom, and he saw them all on the floor but did not know how they got there. Miller claimed Manus was fighting the officers on the floor, kicking, cursing, and trying to keep them from handcuffing him. Miller testified that he entered the room and held Manus' right foot to keep him from kicking. Miller testified that at some point after that the officers were able to handcuff Manus and that they stood him up and walked him out of the room.

Finally, Eupora Police Chief Gregg Hunter testified that he arrived just after Miller and that he heard what sounded like a door being kicked in before he entered the residence. Hunter testified that when he got to the bedroom Manus, Smith, Kilgore, May, and Miller were already

struggling on the floor and that Manus was not yet handcuffed. However, both Kilgore and May testified that Hunter arrived at essentially the same time as Miller and that Manus was still in the bedroom with the door closed. Hunter claimed that he saw May tasing Manus on the leg but did not see Miller spray Manus with mace, although he did smell it in the room. Hunter testified that he was in and out of the bedroom during the altercation because Manus' mother, Lois, kept coming to the door with Manus' young daughter in her arms and he was attempting to make her stay back. At some point, Hunter claimed that he told May to ease off the taser once the officers were able to handcuff Manus. Hunter testified that someone handcuffed Manus while his back was turned and that they then stood Manus up and walked him out.

It is undisputed that Manus failed to comply with the officers' orders to come out of the bedroom on the day in question[4] and that he had a history of resisting arrest.[5] Manus also admitted to sending text messages to his brother while in the bedroom and to calling his brother asking him to come get him. Defendants introduced a series of text messages to and from Manus' cellphone showing that Manus was trying to leave the residence and "leave [M]ississippi

---

[4] Lois Manus did testify in her deposition that Manus came out into the hallway when backup arrived on the scene. However, as explained in detail below, the Court finds her testimony to be unreliable and not worthy of credence.

[5] Kilgore testified that Manus "seemed to be getting bolder and bolder as far as his, you know, unwillingness to – you know, to go with us" and described a previous incident where Manus attempted to use his daughter to avoid being taken into custody. Additionally, May testified about a previous traffic accident where he claimed Manus had resisted arrest and attempted to choke May. May testified that he had only been able to arrest Manus on that occasion by deploying his taser. In particular, the Court found the following exchange between Plaintiffs' counsel and Miller to be important:

> Q: Okay. So Conway, when he messed with officers, it always turned out to be a problem, wasn't it? He just didn't seem to understand to be quiet and listen and comply, did he?
>
> A: I don't know if it was every time, but I know there had been problems, sir.
>
> Q: He wasn't usually the guy when you had to deal with that you expected to go easy. He always made it tough on the officers trying to do their job, correct?
>
> A: I knew that at times he had, yes, sir.

real quick" because he was "about to go back to jail if [he] [couldn't] get away from here tonight." And, importantly, Lois Manus admitted on the stand that Manus had resisted arrest:

> Q: Let me make sure I make this clear for the record. Was Conway resisting in any way before he was struck with the bat?

> Answer: He had been before because he didn't want his hands handcuffed. He wanted to talk to his little girl before he left.

Manus testified that he saw Smith in the reflection of a mirror holding a light wooden-colored bat immediately after he was hit the first time and that this wooden bat eventually wound up lying beside him on the floor. However, the bat introduced into evidence by Plaintiffs and identified by Smith as the one he took into the residence was made of aluminum and was bright purple in color.

Further, the only other witness to testify that Smith hit Manus with the bat was Manus' mother, Lois, and the Court finds her testimony in this regard to be unreliable and incredible. At trial, Lois testified that she was standing in the hallway with Hunter and Crenshaw and saw Smith, Kilgore, May, and Miller in the room with Manus. She testified that she saw the officers handcuff Manus while he was standing and that he was not resisting. She claimed that, after Manus was handcuffed, she saw Smith hit Manus with a bat between his neck and shoulders twice and that Smith then "dropped his knee down in between his back." According to Lois, Miller maced Manus and the officers tased him while he was on the floor and Lois and Hunter watched from the doorway.

However, on cross examination, Lois admitted to having previously testified at her deposition that the first thing she saw in the bedroom was Manus already on the ground with Kilgore and May tasing him, Miller macing him, and Smith standing with something in his

hand.[6]  At the time of her deposition, Lois testified that she saw this when she followed Hunter down the hall some ten to fifteen minutes after Smith had entered the bedroom.[7]

But Lois also testified in her deposition that she had stayed in the living room of the home during the altercation because she was holding Manus' young daughter.  When pressed as to how she could have seen Smith hit Manus with the bat inside the bedroom, Lois claimed that the beating had actually occurred in the hallway.  Similarly, at her deposition, Lois testified that she saw Smith hit Manus with the bat before Miller arrived on the scene, but once on the stand, she testified that Miller was in the room at the time.  Plaintiffs introduced Lois' errata sheet wherein she sought to clarify her deposition testimony regarding when she went to the room, how long it took Hunter to arrive on the scene, whether Miller was in the room at the time Smith hit Manus with the bat, and which officers were in the room.  Still, Lois admitted on the stand that her corrections directly contradicted other testimony she had given regarding the timeline, location, and persons present during the altercation.  Accordingly, the Court finds Lois' testimony with regard to the altercation to be so inconsistent that it should be afforded little to no weight.

In contrast, the Court finds the collective testimony of the officers to be reliable and credible.  While some of the details of the officers' individual accounts varied, the Court finds their testimony as to the events of September 7 to be consistent as a whole and therefore worthy of credence.  In fact, Manus' own testimony also mirrors the officers' accounts in many ways,

---

[6] In her deposition, Lois testified that Smith was holding "a jar thing in his hand."  However, at trial, she testified that Smith was actually holding the bat.

[7] Lois testified at her deposition that Miller had arrived on the scene approximately five to ten minutes after Smith entered the bedroom, that Hunter arrived after Miller, and that she walked down the hall to look into the bedroom some five minutes later.  At trial, Lois testified that the time had actually been shorter, closer to two or three minutes.

lending additional support to their version of events and casting additional doubt on Lois Manus' testimony.

Aside from the testimony of Manus and his mother, Plaintiffs rely on the testimony of several expert witnesses to establish that Manus' injury was caused by having been beaten with a bat. However, the Court finds that the testimony presented at trial falls short of establishing this fact. Rather, Dr. Louis Rosa, an expert in the field of neurosurgery and the neurosurgeon who diagnosed and treated Manus,[8] testified in his deposition only that it is "possible" that being hit with a bat could have caused Manus' spinal injury and that being struck from the back is a "conceivable mechanism[] of injury."[9] Similarly, Dr. Erin Barnhart, an expert board certified anatomic pathologist and the Deputy Chief Medical Examiner who performed an autopsy of Manus' body after his death, testified that being hit with a bat was one of six possible causes of Manus' injury that she identified from the officers' written statements and from deposition testimony taken as a part of this litigation. Though Dr. Barnhart testified that it was probable that "something like a bat" broke Manus' neck, she also testified that she could not identify to a reasonable degree of medical certainty what caused the injury.

Plaintiffs also offered the expert testimony of Dr. Orhan Ilercil, a board certified neurosurgeon who performed an independent medical evaluation of Manus at the Plaintiffs' request in May 2012. Dr. Ilercil testified that he spoke with Manus, reviewed Manus' medical records, and performed a physical examination of Manus. Dr. Ilercil testified that Manus' injury was consistent with Manus' statements that he had been hit with a bat, but also admitted that

_____

[8] Dr. Rosa diagnosed Manus with quadriplegia caused by a fracture at the C6-C7 vertebrae on September 16, 2010.

[9] Dr. Rosa also testified that being thrown against the wall of a jail cell would be a conceivable mechanism of injury.

Manus' neck could have been broken during an altercation where Manus violently resisted law enforcement and no bat was used.[10]

Further, Defendants offered the testimony of Dr. Thomas Cullom, also an expert board certified neurosurgeon, who reviewed Manus' medical records at the Defendants' request and determined that Manus' injury was too severe to have occurred on September 7, 2010. It is undisputed that Manus was able to talk and walk without assistance following the altercation on September 7 and that he continued to be able to sit, stand, talk, and walk on September 8 when he was examined at the jail by Corrie Bennett, a licensed paramedic.[11] Bennett testified that she performed a physical evaluation of Manus where she palpated his body from head to toe and that she found no indication of a neck fracture or other serious injury. She testified that Manus was awake, alert, oriented, and able to follow instructions and that he described his pain as a level five on a scale of one to ten. Whereas Dr. Ilercil testified that Manus likely sustained a fracture during the altercation on September 7 but did not suffer a paralyzing spinal cord injury until some time later, Dr. Cullom testified that Manus' fracture was so severe that his spinal cord would have been "pinched almost in half" and that "usually, when you see something this severe, the patient is rendered immediately quadriplegic."

Perhaps most importantly, the Court finds it particularly probative that neither Manus nor his mother reported the alleged bat attack in the days following the altercation. Lois Manus

---

[10] Specifically, Dr. Ilercil testified, "The patient says he got hit in the back of the head with a bat – back of the neck, I should say. So being hit on the back of the neck with a bat will cause a flexion injury. His injury is consistent with a flexion injury." Plaintiffs' counsel later asked, "Did you find any evidence that they – that the officers broke his neck another way without the use of a bat?" Dr. Ilercil responded, "I didn't see anything there. But if you're asking me, can you sustain this injury without a baseball bat? Absolutely. There are a lot of other ways in an altercation to sustain this type of injury." Importantly, no evidence was presented at trial that Dr. Ilercil reviewed any deposition testimony, written officer statements, or other records beyond Manus' medical records or that he relied on any other information with regard to what allegedly happened at Manus' residence on September 7, 2010 beyond what was provided to him by Manus himself.

[11] Manus testified in his deposition that he walked from one cell to another to be examined but that he had to hold onto the cell door to do so. Bennett testified that Manus walked without assistance.

called 911 requesting medical assistance for Manus on September 8, 2010 while he was in the custody at the Webster County jail, but Plaintiffs introduced no evidence that she informed the dispatcher that her son had suffered any type of trauma to his neck. Further, there was no evidence presented that Lois sought any medical treatment for Manus while he was in custody at the Webster County jail until Manus contacted her on September 8 complaining that his legs were getting numb and asking her to call an ambulance to take him to the hospital to be "checked out."

Likewise, when Manus was transported to the Eupora hospital on September 14, 2010, Lois failed to inform the doctors attempting to treat him that he had suffered any alleged trauma to his neck or that he had been beaten with a bat. Dr. Rosa testified that he could not recall Lois mentioning anything to him about a bat and that there was no report of blunt force trauma to Manus' head or neck in the medical records from the physicians who saw Manus before him. Because none of the medical professionals treating Manus suspected a spinal cord injury, no precautions were taken to prevent further damage.

Thus, based on the credible evidence presented at trial, the Court finds that Plaintiffs failed to prove by a preponderance of the evidence that Manus was struck with a bat during the altercation at his residence on September 7, 2010.[12] Additionally, the Court finds that Plaintiffs

---

[12] Plaintiffs also offered the testimony of Dr. Jewel Huffman, who treated Kilgore on September 7 after the altercation at Manus' residence. Dr. Huffman testified that Kilgore stated in the presence of other officers, including Miller, Hunter, and Eupora Police Officer Mitch Jackson that they "tried to break his effing neck," referring to Manus. However, Dr. Huffman also testified that he didn't "think any of them knew at that time that his neck was broken." He testified that "none of them knew the gravity of the situation at that time. They didn't know it." Dr. Huffman was not present at the scene of the altercation and did not offer any testimony relating to a bat.

Additionally, Plaintiffs offered the testimony of Eddie Joe Wofford, an inmate at the Webster County jail at the time Manus was in custody. Wofford testified that he witnessed Smith, Kilgore, Hunter, Miller, Jackson, and Webster County Sheriff's Deputy Toby Britt standing outside the jail a little after noon on September 7 talking about going to pick up Manus. However, Manus himself testified that Kilgore and May radioed for assistance because they believed he had a knife. Further, the officers all denied having had such a meeting that day and, though Wofford testified the officers all appeared to be "[p]utting on their gear and stuff for – to go get him," Jackson and Britt never went to Manus' residence. The Court finds that neither the testimony of Huffman nor Wofford established that Smith hit Manus with a bat on September 7.

likewise failed to prove by a preponderance of the evidence that Manus was compliant and not resisting during the altercation. The Court finds that Manus physically resisted the officers, that he failed to comply with the officers' commands, and that the officers subdued him with the use of physical force, mace, and tasers, but not a bat.

After he was escorted from the residence, Manus was placed in May's patrol car and transported to the Webster County jail. Eupora Police Officer Mitch Jackson and Webster County Sheriff's Deputy Toby Britt were waiting at the jail and removed Manus from the patrol car. In his deposition, Manus testified that Jackson and Britt drug him out of the car and that he landed on his bottom. Manus was questioned about this incident by his attorney and by defense counsel and each time he simply testified that the officers "drug [him] out of the car." However, Manus later submitted the following correction to his deposition which was admitted at trial:

> Clarification of testimony – . . . What I was trying to explain is not clear. I am verifying what I was trying to say. . . . Officer Jackson pulled me face first with my hands handcuffed behind my back out of the car and dropped me face down on the pavement. Deputy Britt and Officer Jackson then picked me up and dropped me on my bottom in a sitting position.

The Court finds this "clarification" to be inconsistent with Manus previous testimony. Manus originally testified that:

> [W]henever we got there, . . . Deputy Mays said, 'Get this crazy son-of-a-bitch out of my car.' And Toby Britt come on the right side and pulled me out of the car, him and – and on the left side – no, I got it backwards. Officer – Officer Jackson was on the right side and Deputy Britt was on the left.
>
> Q: Okay. And did Officer Jackson grab one side of your body and Deputy Britt grab the other?
>
> A: Yes, ma'am.
>
> Q: And you say they drug you out of the car?
>
> A: Yes, ma'am.

Further, Jackson, Britt, and May all testified that Manus was resisting and fighting when Jackson attempted to remove him from the vehicle.

After the officers stood Manus up, Jackson escorted him into the jail. Jackson, Britt, and May testified that Manus continued resisting as he was led into the jail, and Britt testified that he told Jackson to take Manus directly to a cell to prevent him from hurting himself or someone else. Jackson described the walk to the cell as "a serious struggle all the way down." Manus, on the other hand, testified that he was not resisting and that Jackson "slammed" him against the iron bars as they walked to the cell.

Once inside the cell, Manus testified that Jackson "pushe[d] [him] down to the floor." Manus claimed that he was not resisting and that May and Jackson removed all of his clothes, except his underwear. Manus testified that he stood back up and May threatened to tase him if he did not cooperate, and then they closed the cell door and left as he was requesting medical attention.

Again, Plaintiffs introduced a correction to Manus' deposition which was admitted at trial:

> Clarification of testimony – . . . I forgot to tell you this happened. When they first walked me into the jail cell Officer Jackson was holding me from behind. My hands were handcuffed behind my back. Jackson tripped me from the back and shoved me forward into the cell. I fell face first to the ground landing on my face and shoulders. That hurt my neck even more. They laughed. Deputy May and Officer Jackson picked me up as I was saying I am hurting. They took off the handcuffs and told me to take off my clothes.

However, again, Manus' testimony is inconsistent. Manus claimed in his deposition that the officers told him to get on the floor and take his clothes off. Manus testified that he "wasn't resisting or anything, [he] just felt uncomfortable," and that he did not follow the officers' command until May threatened to tase him. Manus claimed he "never was on the ground," that

Jackson did not touch him after he removed his clothes, and that he did not request medical treatment from Jackson.

Jackson testified that, once in the cell, he ordered Manus to get down on the ground and that Manus failed to comply. Jackson described performing a "controlled takedown" where he held Manus' forearm and twisted his body so that he was able to take Manus to the ground. It was at that point, according to Jackson, that the officers removed the handcuffs from Manus' wrists. In his written statement, May claimed that Manus refused to follow Jackson's orders to lay down on the floor and Jackson "tripped Conway and took him to the ground," where he removed the handcuffs and Manus' clothing. At trial, May testified Jackson had performed a controlled takedown using balance to get Manus under control. May testified that Manus went down to the ground on his right side and then "ended up on his chest . . . ."

For his part, Britt testified that he never saw Jackson take Manus to the ground while in the cell. However, in his written statement, Britt claimed that he did see Manus fall to the floor after Jackson had removed the handcuffs and after Jackson had threatened to tase Manus in response to him having "acted like he wanted to fight." Again, the Court finds that Plaintiffs failed to prove that Manus was compliant and not resisting while being taken into the jail. Based upon the evidence presented as a whole, the Court finds that Manus continued to resist and ignore the officers' commands, leading to Jackson taking Manus to the ground inside the cell to secure his compliance. Manus was talking and standing on his own when Jackson and the other officers left the cell.

None of the individual Defendants had any further contact with Manus after September 7, 2010.[13] Manus was transported to the Webster County hospital on September 14, 2010 and

---

[13] The Court dealt specifically with this issue in its Order On Motion to Clarify [365], finding that, to the extent Plaintiffs' Amended Complaint [249] stated claims against the Municipal Defendants for denial of medical care

subsequently airlifted to North Mississippi Medical Center in Tupelo, Mississippi where he was eventually diagnosed with quadriplegia caused by a fracture at the C6-C7 vertebrae. He died on December 1, 2012 as a result of complications of quadriplegia caused by blunt force neck trauma.

*Conclusions of Law*

<u>Qualified Immunity</u>

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (internal quotations omitted). Once a government official asserts qualified immunity, it is the plaintiff's burden to prove that the official is not entitled to it. <u>Michalik v. Hermann</u>, 422 F.3d 252, 258 (5th Cir. 2005).

In evaluating qualified immunity, the Court employs a two-step process. <u>Cantrell v. City of Murphy</u>, 666 F.3d 911, 922 (5th Cir. 2012), <u>cert. denied,</u> 133 S. Ct. 119, 184 L. Ed. 2d 25 (2012). The Court must determine (1) whether the plaintiff has alleged a violation of a clearly established constitutional right and (2) whether the government official's conduct was objectively reasonable under the law at the time of the incident. <u>Michalik</u> at 257-58. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Reichle v. Howards</u>, --- U.S. ---, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotations omitted). "Thus, the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Mendenhall v. Riser</u>, 213 F.3d 226, 230

---

based upon their acts or omissions occurring after September 7, 2010, any such claims were dismissed with prejudice at summary judgment.

(5th Cir. 2000) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The Court may address these issues in any order according to its sound discretion and in light of the circumstances of the case at hand. <u>Pearson</u>, 555 U.S. at 236, 129 S. Ct. 808.

As discussed in detail below, the Court finds the first step of the qualified immunity defense to be dispositive, and therefore, it need not address the issue of whether the individual Defendants' actions were objectively reasonable.

Bystander Excessive Force

The Fifth Circuit has held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." <u>Hale v. Townley</u>, 45 F.3d 914, 919 (5th Cir. 1995) (citation omitted). Further, "[t]he fact that [officers] [a]re from different law enforcement agencies does not as a matter of law relieve [them] from liability for a failure to intervene." <u>Id.</u> "[L]iability under § 1983 can attach when the bystander officer 'had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it.'" <u>Deshotels v. Marshall</u>, 454 F. App'x 262, 268 (5th Cir. 2011) (citing <u>Hale</u>, 45 F.3d at 919).

In the case at bar, the Court has found that Miller and Hunter went to Manus' residence on the day in question in response to May's call for assistance claiming that Manus had a knife. When they arrived, Manus was in a bedroom refusing to comply with commands to come out into the hallway. The Court has additionally found that, once Kilgore kicked down the bedroom door, Manus resisted the officers and tried to keep them from handcuffing him. Miller and Hunter witnessed May tase Manus, Kilgore and Smith physically struggle and attempt to restrain Manus, and Hunter witnessed Miller mace Manus. Once the officers were able to place Manus in handcuffs, they picked him up and escorted him out of the residence.

Based on the Court's finding that Manus resisted the officers and failed to comply with their commands throughout this altercation, the Court cannot say that Hunter and Miller witnessed use of force against Manus that they had a reasonable opportunity to realize was excessive and that they failed to intervene despite having a reasonable opportunity to do so. Deshotels, 454 F. App'x at 268 (citation omitted). Therefore, the Court finds in favor of Defendants with regard to Plaintiffs' claims against Hunter and Miller, in their individual and official capacities, and the cities of Eupora and Mathiston based upon a theory of bystander liability.

Denial of Medical Care

In order to prevail on a claim of deliberate denial of medical care, a plaintiff must show that the defendant had "subjective knowledge of a substantial risk of serious medical harm" and was deliberately indifferent in disregarding that risk. Nerren v. Livingston Police Dept., 86 F.3d 469, 473 (5th Cir. 1996) (citing Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)). "Deliberate indifference is an extremely high standard to meet." Blank v. Eavenson, 530 F. App'x 364, 368 (5th Cir. 2013) cert. denied, --- U.S. ---, 134 S. Ct. 623, 187 L. Ed. 2d 404 (2013) (quoting Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)). The Fifth Circuit has held that a plaintiff alleging such a claim must "establish more than the typical quantum of evidence necessary to overcome a qualified immunity defense." Wagner v. Bay City, Tex., 227 F.3d 316, 324 (5th Cir. 2000). Specifically, a plaintiff "must show not only that the defendants' actions in failing to provide [him] medical attention . . . were objectively unreasonable, but also that defendants intended the consequence of those actions." Id. "Mere negligence will not suffice, and deliberate indifference, i.e., the subjective intent to cause harm,

cannot be inferred from a failure to act reasonably." Blank, 530 F. App'x at 368 (quoting Wagner, 227 F.3d at 324) (alterations, citations, and internal quotation marks omitted)).

Plaintiffs have not shown by a preponderance of the evidence that Hunter and Miller had the requisite subjective intent to cause Manus harm when they did not provide him medical attention following the altercation at his residence on September 7, 2010.  The Court has found that Plaintiffs failed to meet their burden to prove that Hunter and Miller witnessed Manus being beaten with a bat.  Additionally, Manus was walking, talking, and continuing to struggle against the officers when he was escorted into a patrol car and transported to the Webster County jail. Manus himself testified that he was standing and talking when Jackson, the last individual Defendant to see him before he was transported to the hospital, left his cell for the last time.

Further, it is undisputed that Manus was examined by a licensed paramedic on September 8 who found no obvious signs of injury.  Plaintiffs' own expert, Dr. Ilercil, testified that it is not uncommon for experienced physicians to miss spinal cord injuries of the type Manus suffered, and Dr. Cullom testified that he would not expect law enforcement officers to suspect a spinal injury where a medical professional such as Bennett had not suspected the same.  Accordingly, the Court finds in favor of Defendants with regard to Plaintiffs' claims against Hunter and Miller, in their individual and official capacities, and the cities of Eupora and Mathiston for denial of medical care.

## Use of Excessive Force

At summary judgment, the Court determined that Plaintiffs' claims against Jackson for the use of excessive force were properly analyzed under the Fourth Amendment because Manus had not been "in detention awaiting trial for a significant period of time" or "released from the arresting officer's custody" when Jackson's alleged actions took place. Valencia v. Wiggins, 981

F.2d 1440, 1443-44 (5th Cir. 1993), <u>cert.</u> <u>denied</u>, 509 U.S. 905, 113 S. Ct. 2998, 125 L. Ed. 2d 691 (1993) (holding that the Fourth Amendment does not provide "an appropriate constitutional basis for protecting against deliberate official uses of force occurring . . . *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time.") (emphasis in original)); <u>see</u> <u>also</u> <u>Graham v. Connor</u>, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (Claims of excessive force used by law enforcement officials "in the course of making an arrest, investigatory stop, or other 'seizure' of [a plaintiff's] person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard.").

"[T]o state a violation of the Fourth Amendment prohibition on excessive force, the plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." <u>Bush v. Strain</u>, 513 F.3d 492, 500-01 (5th Cir. 2008) (citing <u>Flores v. City of Palacios</u>, 381 F.3d 391, 396 (5th Cir. 2004)). "The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." <u>Id.</u> (citing <u>Ikerd v. Blair</u>, 101 F.3d 430, 434 (5th Cir. 1996)). "Specifically, the court should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. 1865). Importantly, an officer's subjective intent is irrelevant. <u>Graham</u>, 490 U.S. at 397, 109 S. Ct. 1865 ("An officer's evil intentions will not make a Fourth Amendment violation

out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

As previously stated, at trial Plaintiffs abandoned their excessive force claim against Miller based on his use of mace during the altercation at issue. Additionally, the Court determined in its Memorandum Opinion [325] at summary judgment and later clarified in its Order on Reconsideration [338] that the city of Eupora is not liable for Jackson's alleged actions.[14] Thus, the only issue for the Court to decide is whether Jackson is individually liable for use of excessive force against Manus.

The Court finds that he is not. As explained above, the Court finds based upon the credible evidence that Manus continued to resist and refused to comply with the officers' orders as he was being escorted into the jail and cell. Plaintiffs have not shown that Jackson's actions in removing Manus from the patrol car, escorting him through the jail, or taking him to the ground inside the cell were excessive to the need to secure Manus' compliance or that Jackson's use of force was objectively unreasonable. Therefore, the Court finds in favor of Jackson with regard to Plaintiffs' claim against him in his individual capacity for use of excessive force.

<u>State Law Claims</u>

Pursuant to § 11-46-9(1)(c) of the Mississippi Code:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

"[R]eckless disregard is more than mere negligence, but less than an intentional act."

<u>Scott v. City of Goodman</u>, 997 So. 2d 270, 276 (Miss. Ct. App. 2008). The Mississippi Supreme

---

[14] Additionally, no claim against the city of Eupora is listed in the Pretrial Order [379].

Court has explained that the term "reckless disregard," construed in the context of § 11-46-9(1)(c), "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." <u>Turner v. City of Ruleville</u>, 735 So. 2d 226, 230 (Miss. 1999). "Similar to an excessive force claim under § 1983, the determination of whether there was reckless disregard will depend upon the circumstances surrounding the incident that caused the injury.") <u>Buchanan v. Gulfport Police Dep't</u>, 2012 WL 1906523, at *12 (S.D. Miss. May 25, 2012) (citing <u>Scott</u>, 997 So. 2d at 277), <u>aff'd</u>, 530 F. App'x 307 (5th Cir. 2013).

Here, Plaintiffs have failed to show that Defendants "acted in reckless disregard of the safety and well-being" of Manus. MISS. CODE ANN. § 11-46-9(1)(c). Plaintiffs have not proven by a preponderance of the evidence that Hunter, Miller, or Jackson knowingly or intentionally harmed Manus by committing a wrongful act.[15] Rather, the evidence at trial established that these Defendants responded to a call for assistance subduing an individual who had reportedly attacked an officer with a knife and then barricaded himself inside his residence, that they either observed or participated in attempting to gain control of Manus who was physically resisting multiple officers, and that they observed him walking without assistance, talking, and continuing to resist after he had been handcuffed and removed from his residence. The Court finds in favor of Defendants with regard to Plaintiffs' state law claims relating to the individual Defendants' acts during the arrest of Manus.

Finally, the Court recognized at summary judgment that Plaintiffs' wrongful death claims based on acts or omissions committed within the course and scope of employment and arising

---

[15] The Court notes that Plaintiffs likewise failed to prove that Crenshaw knowingly or intentionally harmed Manus by committing a wrongful act. As noted above, Plaintiffs abandoned their bystander excessive force claim against Crenshaw at trial. To the extent, Plaintiffs maintained viable state law claims against him, the Court also finds in favor of Crenshaw.

while Manus was in custody were barred by Section 11-46-9(1)(m) of the Mississippi Code.[16]

Further, the Court acknowledged that for purposes of the MTCA:

> an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

MISS. CODE. ANN. § 11-46-7(2). The evidence at trial did not establish that any individual Defendant acted outside the course and scope of his employment. Thus, to the extent that the individual Defendants might be subject to Plaintiffs' wrongful death claims despite the Court's determination that they did not act with reckless disregard, the Court additionally finds in favor of Defendants.

*Conclusion*

Based on the law and the evidence presented, the Court finds that Plaintiffs failed to carry their burden that Defendants violated Manus' federally protected rights, acted in reckless disregard, or acted outside the course and scope of their employment based upon their participation in the events of September 7, 2010.

SO ORDERED AND ADJUDGED, this the 31st day of March, 2015.

 /s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[16] "A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed." MISS. CODE ANN. § 11-46-9(1)(m).